# TASHJIAN, SECRETARY OF STATE OF CONNECTICUT *v.* REPUBLICAN PARTY OF CONNECTICUT
## ET AL.

No. 85-766.   Argued October 8, 1986—Decided December 10, 1986

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, and POWELL, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 230. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR, J., joined, *post*, p. 234.

*Elliot F. Gerson*, Special Assistant Attorney General of Connecticut, argued the cause for appellant. With him on the briefs were *Joseph I. Lieberman*, Attorney General, and *Barney Lapp, Daniel R. Schaefer*, and *Henry S. Cohn*, Assistant Attorneys General.

*David S. Golub* argued the cause and filed a brief for appellees.*

JUSTICE MARSHALL delivered the opinion of the Court.

Appellee Republican Party of the State of Connecticut (Party) in 1984 adopted a Party rule which permits independent voters—registered voters not affiliated with any political party—to vote in Republican primaries for federal and state-wide offices. Appellant Julia Tashjian, the Secretary of the State of Connecticut, is charged with the administration of the State's election statutes, which include a provision requiring voters in any party primary to be registered mem-

---

*Briefs of *amici curiae* urging reversal were filed for the State of New York et al. by *Robert Abrams*, Attorney General of New York, *Robert Hermann*, Solicitor General, *Patrick Barnett-Mulligan, Lisa Margaret Smith*, and *Betsy Broder*, Assistant Attorneys General, *Charles A. Graddick*, Attorney General of Alabama, *Robert K. Corbin*, Attorney General of Arizona, and *Anthony B. Ching*, Solicitor General, *Charles M. Oberly III*, Attorney General of Delaware, *Jim Smith*, Attorney General of Florida, *Neil F. Hartigan*, Attorney General of Illinois, and *Roma J. Stewart*, Solicitor General, *William J. Guste, Jr.*, Attorney General of Louisiana, *James E. Tierney*, Attorney General of Maine, and *Cabanne Howard*, Deputy Attorney General, *Brian McKay*, Attorney General of Nevada, *Lacy H. Thornburg*, Attorney General of North Carolina, *Nicholas J. Spaeth*, Attorney General of North Dakota, *Anthony J. Celebrezze, Jr.*, Attorney General of Ohio, *Michael Turpen*, Attorney General of Oklahoma, *LeRoy S. Zimmerman*, Attorney General of Pennsylvania, *W. J. Michael Cody*, Attorney General of Tennessee, and *A. G. McClintock*, Attorney General of Wyoming; and for William J. Cibes, Jr., et al. by *Timothy D. Bates*.

*Stephen E. Gottlieb* filed a brief for James MacGregor Burns et al. as *amici curiae* urging affirmance.

*Bruce A. Morrison, pro se*, filed a brief for Senator Christopher J. Dodd et al. as *amici curiae*.

bers of that party. Conn. Gen. Stat. § 9–431 (1985).[1] Appellees, who in addition to the Party include the Party's federal officeholders and the Party's state chairman, challenged this eligibility provision on the ground that it deprives the Party of its First Amendment right to enter into political association with individuals of its own choosing. The District Court granted summary judgment in favor of appellees. 599 F. Supp. 1228 (Conn. 1984). The Court of Appeals affirmed. 770 F. 2d 265 (CA2 1985). We noted probable jurisdiction, 474 U. S. 1049 (1986), and now affirm.

I

In 1955, Connecticut adopted its present primary election system. For major parties,[2] the process of candidate selection for federal and statewide offices requires a statewide convention of party delegates; district conventions are held to select candidates for seats in the state legislature. The party convention may certify as the party-endorsed candidate any person receiving more than 20% of the votes cast in a roll-call vote at the convention. Any candidate not endorsed by the party who received 20% of the vote may challenge the party-endorsed candidate in a primary election, in which the candidate receiving the plurality of votes becomes the party's nominee. Conn. Gen. Stat. §§ 9–382, 9–400, 9–444 (1985). Candidates selected by the major parties, whether through convention or primary, are automatically accorded a place on the ballot at the general election.

---

[1] The statute provides in pertinent part: "No person shall be permitted to vote at a primary of a party unless he is on the last-completed enrollment list of such party in the municipality or voting district . . . ."

[2] A "major party" is defined as "a political party or organization whose candidate for governor at the last-preceding election for governor received . . . at least twenty per cent of the whole number of votes cast for all candidates for governor." Conn. Gen. Stat. § 9–372(5)(B) (1985). The Democratic and Republican parties are the only major parties in the State under this definition.

§ 9–379.   The costs of primary elections are paid out of public funds.   See, *e. g.*, § 9–441.

The statute challenged in these proceedings, § 9–431, has remained substantially unchanged since the adoption of the State's primary system.   In 1976, the statute's constitutionality was upheld by a three-judge District Court against a challenge by an independent voter who sought a declaration of his right to vote in the Republican primary.   *Nader* v. *Schaffer*, 417 F. Supp. 837 (Conn.), summarily aff'd, 429 U. S. 989 (1976).   In that action, the Party opposed the plaintiff's efforts to participate in the Party primary.

Subsequent to the decision in *Nader*, however, the Party changed its views with respect to participation by independent voters in Party primaries.   Motivated in part by the demographic importance of independent voters in Connecticut politics,[3] in September 1983 the Party's Central Committee recommended calling a state convention to consider altering the Party's rules to allow independents to vote in Party primaries.   In January 1984 the state convention adopted the Party rule now at issue, which provides:

> "Any elector enrolled as a member of the Republican Party and any elector not enrolled as a member of a party shall be eligible to vote in primaries for nomination of candidates for the offices of United States Senator, United States Representative, Governor, Lieutenant Governor, Secretary of the State, Attorney General, Comptroller and Treasurer."   App. 20.

During the 1984 session, the Republican leadership in the state legislature, in response to the conflict between the newly enacted Party rule and § 9–431, proposed to amend the statute to allow independents to vote in primaries when permitted by Party rules.   The proposed legislation was de-

---

[3] The record shows that in October 1983 there were 659,268 registered Democrats, 425,695 registered Republicans, and 532,723 registered and unaffiliated voters in Connecticut.   2 App. to Juris. Statement 244.

feated, substantially along party lines, in both houses of the legislature, which at that time were controlled by the Democratic Party.[4]

The Party and the individual appellees then commenced this action in the District Court, seeking a declaration that § 9–431 infringes appellees' right to freedom of association for the advancement of common political objectives guaranteed by the First and Fourteenth Amendments, and injunctive relief against its further enforcement. After discovery, the parties submitted extensive stipulations of fact to the District Court, which granted summary judgment for appellees. The District Court concluded that "[a]ny effort by the state to substitute its judgment for that of the party on . . . the question of who is and is not sufficiently allied in interest with the party to warrant inclusion in its candidate selection process . . . substantially impinges on First Amendment rights." 599 F. Supp., at 1238. Rejecting the state interests proffered by appellant to justify the statute, the District Court held that "as applied to the Republican Party rule permitting unaffiliated voters to participate in certain Republican Party primaries, the statute abridges the right of association guaranteed by the First Amendment." *Id.*, at 1241.

The Court of Appeals affirmed, holding that § 9–431 "substantially interferes with the Republican Party's first amendment right to define its associational boundaries, determine the content of its message, and engage in effective political association." 770 F. 2d, at 283.

## II

We begin from the recognition that "[c]onstitutional challenges to specific provisions of a State's election laws . . . cannot be resolved by any 'litmus-paper test' that will separate valid from invalid restrictions." *Anderson* v. *Cele-*

---

[4] In the November 1984 elections, the Republicans acquired a majority of seats in both houses of the state legislature, and an amendment to § 9–431 was passed, but was vetoed by the Democratic Governor.

*brezze,* 460 U. S. 780, 789 (1983) (quoting *Storer* v. *Brown,* 415 U. S. 724, 730 (1974)). "Instead, a court . . . must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." 460 U. S., at 789.

The nature of appellees' First Amendment interest is evident. "It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 460 (1958); see *NAACP* v. *Button,* 371 U. S. 415, 430' (1963); *Bates* v. *Little Rock,* 361 U. S. 516, 522–523 (1960). The freedom of association protected by the First and Fourteenth Amendments includes partisan political organization. *Elrod* v. *Burns,* 427 U. S. 347, 357 (1976) (plurality opinion); *Buckley* v. *Valeo,* 424 U. S. 1, 15 (1976). "The right to associate with the political party of one's choice is an integral part of this basic constitutional freedom." *Kusper* v. *Pontikes,* 414 U. S. 51, 57 (1973).

The Party here contends that § 9–431 impermissibly burdens the right of its members to determine for themselves with whom they will associate, and whose support they will seek, in their quest for political success. The Party's attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association. As we have said, the freedom to join together in furtherance of common political beliefs "necessarily presupposes the freedom to identify the people who constitute the association." *Democratic Party of*

*United States* v. *Wisconsin ex rel. La Follette*, 450 U. S. 107, 122 (1981).

A major state political party necessarily includes individuals playing a broad spectrum of roles in the organization's activities. Some of the Party's members devote substantial portions of their lives to furthering its political and organizational goals, others provide substantial financial support, while still others limit their participation to casting their votes for some or all of the Party's candidates. Considered from the standpoint of the Party itself, the act of formal enrollment or public affiliation with the Party is merely one element in the continuum of participation in Party affairs, and need not be in any sense the most important.[5]

Were the State to restrict by statute financial support of the Party's candidates to Party members, or to provide that only Party members might be selected as the Party's chosen nominees for public office, such a prohibition of potential association with nonmembers would clearly infringe upon the rights of the Party's members under the First Amendment to organize with like-minded citizens in support of common political goals. As we have said, " '[a]ny interference with the freedom of a party is simultaneously an interference with the freedom of its adherents.' " *Democratic Party, supra,* at 122 (quoting *Sweezy* v. *New Hampshire,* 354 U. S. 234, 250 (1957)).[6] The statute here places limits upon the group of

---

[5] Indeed, acts of public affiliation may subject the members of political organizations to public hostility or discrimination; under those circumstances an association has a constitutional right to protect the privacy of its membership rolls. *Bates* v. *Little Rock,* 361 U. S. 516, 523–524 (1960); *NAACP* v. *Alabama ex rel. Patterson,* 357 U. S. 449, 462 (1958).

[6] It is this element of potential interference with the rights of the Party's members which distinguishes the present case from others in which we have considered claims by nonmembers of a party seeking to vote in that party's primary despite the party's opposition. In this latter class of cases, the nonmember's desire to participate in the party's affairs is overborne by the countervailing and legitimate right of the party to determine its own membership qualifications. See *Rosario* v. *Rockefeller,* 410

registered voters whom the Party may invite to participate in the "basic function" of selecting the Party's candidates. *Kusper* v. *Pontikes, supra,* at 58. The State thus limits the Party's associational opportunities at the crucial juncture at which the appeal to common principles may be translated into concerted action, and hence to political power in the community.[7]

U. S. 752 (1973); *Nader* v. *Schaffer,* 417 F. Supp. 837 (Conn.), summarily aff'd, 429 U. S. 989 (1976). Similarly, the Court has upheld the right of national political parties to refuse to seat at their conventions delegates chosen in state selection processes which did not conform to party rules. See *Democratic Party of United States* v. *Wisconsin ex rel. La Follette,* 450 U. S. 107 (1981); *Cousins* v. *Wigoda,* 419 U. S. 477 (1975). These situations are analytically distinct from the present case, in which the Party and its members seek to provide enhanced opportunities for participation by willing nonmembers. Under these circumstances, there is no conflict between the associational interests of members and nonmembers. See generally Note, Primary Elections and the Collective Right of Freedom of Association, 94 Yale L. J. 117 (1984).

[7] Appellant contends that any infringement of the associational right of the Party or its members is *de minimis,* because Connecticut law, as amended during the pendency of this litigation, provides that any previously unaffiliated voter may become eligible to vote in the Party's primary by enrolling as a Party member as late as noon on the last business day preceding the primary. Conn. Gen. Stat. § 9–56 (1985). Thus, appellant contends, any independent voter wishing to participate in any Party primary may do so.

This is not a satisfactory response to the Party's contentions for two reasons. First, as the Court of Appeals noted, the formal affiliation process is one which individual voters may employ in order to associate with the Party, but it provides no means by which the members of the Party may choose to broaden opportunities for joining the association by their own act, without any intervening action by potential voters. 770 F. 2d, at 281, n. 24. Second, and more importantly, the requirement of public affiliation with the Party in order to vote in the primary conditions the exercise of the associational right upon the making of a public statement of adherence to the Party which the State requires regardless of the actual beliefs of the individual voter. Cf. *Wooley* v. *Maynard,* 430 U. S. 705, 714–715 (1977); *West Virginia Board of Education* v. *Barnette,* 319 U. S. 624, 633–634 (1943). As counsel for appellees conceded at oral argument, a requirement that independent voters merely notify state authorities of their inten-

It is, of course, fundamental to appellant's defense of the State's statute that this impingement upon the associational rights of the Party and its members occurs at the ballot box, for the Constitution grants to the States a broad power to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, which power is matched by state control over the election process for state offices. But this authority does not extinguish the State's responsibility to observe the limits established by the First Amendment rights of the State's citizens. The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote, see *Wesberry* v. *Sanders*, 376 U. S. 1, 6–7 (1964), or, as here, the freedom of political association. We turn then to an examination of the interests which appellant asserts to justify the burden cast by the statute upon the associational rights of the Party and its members.

## III

Appellant contends that § 9–431 is a narrowly tailored regulation which advances the State's compelling interests by ensuring the administrability of the primary system, preventing raiding, avoiding voter confusion, and protecting the responsibility of party government.

## A

Although it was not presented to the Court of Appeals as a basis for the defense of the statute, appellant argues here that the administrative burden imposed by the Party rule is a sufficient ground on which to uphold the constitutionality of

tion to vote in the Party primary would be acceptable as an administrative measure, but "[t]he problem is that the State is insisting on a public act of affiliation . . . joining the Republican Party as a condition of this association." Tr. of Oral Arg. 40.

§ 9–431.[8]  Appellant contends that the Party's rule would require the purchase of additional voting machines, the training of additional poll workers, and potentially the printing of additional ballot materials specifically intended for independents voting in the Republican primary.  In essence, appellant claims that the administration of the system contemplated by the Party rule would simply cost the State too much.

Even assuming the factual accuracy of these contentions, which have not been subjected to any scrutiny by the District Court, the possibility of future increases in the cost of administering the election system is not a sufficient basis here for infringing appellees' First Amendment rights.  Costs of administration would likewise increase if a third major party should come into existence in Connecticut, thus requiring the State to fund a third major-party primary.  Additional voting machines, poll workers, and ballot materials would all be necessary under these circumstances as well.  But the State could not forever protect the two existing major parties from competition solely on the ground that two major parties are all the public can afford.  Cf. *Anderson* v. *Celebrezze*, 460 U. S. 780 (1983); *Williams* v. *Rhodes*, 393 U. S. 23 (1968).  While the State is of course entitled to take administrative and financial considerations into account in choosing whether or not to have a primary system at all, it can no more restrain the Republican Party's freedom of association for reasons of its own administrative convenience than it could on the same ground limit the ballot access of a new major party.

---

[8] The District Court entered no findings of fact as to the potential administrative changes necessary to implement the Party rule.  As appellant conceded at oral argument, the only evidence in the record before the District Court relating to the administration of the rule was a statement by the State's election attorney in testimony before the legislature that the system would be "workable."  *Id.*, at 20.  Appellant relies here upon affidavits concerning potential administrative burden which were submitted to the Court of Appeals in support of appellant's request for a stay, entered after this Court noted probable jurisdiction.

## B

Appellant argues that § 9–431 is justified as a measure to prevent raiding, a practice "whereby voters in sympathy with one party designate themselves as voters of another party so as to influence or determine the results of the other party's primary." *Rosario* v. *Rockefeller,* 410 U. S. 752, 760 (1973). While we have recognized that "a State may have a legitimate interest in seeking to curtail 'raiding,' since that practice may affect the integrity of the electoral process," *Kusper* v. *Pontikes,* 414 U. S., at 59–60; *Rosario* v. *Rockefeller, supra,* at 761, that interest is not implicated here.[9] The statute as applied to the Party's rule prevents independents, who otherwise cannot vote in any primary, from participating in the Republican primary. Yet a raid on the Republican Party primary by independent voters, a curious concept only distantly related to the type of raiding discussed in *Kusper* and *Rosario,* is not impeded by § 9–431; the independent raiders need only register as Republicans and vote in the primary. Indeed, under Conn. Gen. Stat. § 9–56 (1985), which permits an independent to affiliate with the Party as late as noon on the business day preceding the primary, see n. 7, *supra,* the State's election statutes actually *assist* a "raid" by independents, which could be organized and implemented at the 11th hour. The State's asserted interest in the prevention of raiding provides no justification for the statute challenged here.

---

[9] As we have previously noted, a study commission established by the national Democratic Party concluded that "'the existence of "raiding" has never been conclusively proven by survey research.'" *Democratic Party of United States* v. *Wisconsin ex rel. La Follette,* 450 U. S., at 122–123, n. 23 (quoting Openness, Participation and Party Building: Reforms for a Stronger Democratic Party 68 (Feb. 17, 1978)). In view of our conclusion that § 9–431 is irrelevant to the question of raiding, we express no opinion as to whether the continuing difficulty of proving that raiding is possible attenuates the asserted state interest in preventing the practice.

## C

Appellant's next argument in support of § 9–431 is that the closed primary system avoids voter confusion. Appellant contends that "[t]he legislature could properly find that it would be difficult for the general public to understand what a candidate stood for who was nominated in part by an unknown amorphous body outside the party, while nevertheless using the party name." Brief for Appellant 59. Appellees respond that the State is attempting to act as the ideological guarantor of the Republican Party's candidates, ensuring that voters are not misled by a "Republican" candidate who professes something other than what the State regards as true Republican principles. Brief for Appellees 28.

As we have said, "[t]here can be no question about the legitimacy of the State's interest in fostering informed and educated expressions of the popular will in a general election." *Anderson* v. *Celebrezze,* 460 U. S., at 796. To the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise. Appellant's argument depends upon the belief that voters can be "misled" by party labels. But "[o]ur cases reflect a greater faith in the ability of individual voters to inform themselves about campaign issues." *Id.,* at 797. Moreover, appellant's concern that candidates selected under the Party rule will be the nominees of an "amorphous" group using the Party's name is inconsistent with the facts. The Party is not proposing that independents be allowed to choose the Party's nominee without Party participation; on the contrary, to be listed on the Party's primary ballot continues to require, under a statute not challenged here, that the primary candidate have obtained at least 20% of the vote at a Party convention, which only Party

members may attend. Conn. Gen. Stat. § 9–400 (1985). If no such candidate seeks to challenge the convention's nominee in a primary, then no primary is held, and the convention nominee becomes the Party's nominee in the general election without any intervention by independent voters.[10] Even assuming, however, that putative candidates defeated at the Party convention will have an increased incentive under the Party's rule to make primary challenges, hoping to attract more substantial support from independents than from Party delegates, the requirement that such challengers garner substantial minority support at the convention greatly attenuates the State's concern that the ultimate nominee will be wedded to the Party in nothing more than a marriage of convenience.

In arguing that the Party rule interferes with educated decisions by voters, appellant also disregards the substantial benefit which the Party rule provides to the Party and its members in seeking to choose successful candidates. Given the numerical strength of independent voters in the State, one of the questions most likely to occur to Connecticut Republicans in selecting candidates for public office is how can the Party most effectively appeal to the independent voter? By inviting independents to assist in the choice at the polls between primary candidates selected at the Party convention, the Party rule is intended to produce the candidate and platform most likely to achieve that goal. The state statute is said to decrease voter confusion, yet it deprives the Party and its members of the opportunity to inform themselves as to the level of support for the Party's candidates among a critical group of electors. "A State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism." *Anderson* v. *Celebrezze, supra,* at 798. The State's legitimate interests in preventing voter confusion

---

[10] The record does not disclose the proportion of Connecticut Republican Party nominations that are the result of primary contests.

and providing for educated and responsible voter decisions in no respect "make it necessary to burden the [Party's] rights." 460 U. S., at 789.

## D

Finally, appellant contends that § 9–431 furthers the State's compelling interest in protecting the integrity of the two-party system and the responsibility of party government. Appellant argues vigorously and at length that the closed primary system chosen by the state legislature promotes responsiveness by elected officials and strengthens the effectiveness of the political parties.

The relative merits of closed and open primaries have been the subject of substantial debate since the beginning of this century, and no consensus has as yet emerged.[11]  Appellant

---

[11] At the present time, 21 States provide for "closed" primaries of the classic sort, in which the primary voter must be registered as a member of the party for some period of time prior to the holding of the primary election.  See Ariz. Rev. Stat. Ann. § 16–467 (1984); Cal. Elec. Code Ann. § 501 (West Supp. 1986); Colo. Rev. Stat. § 1–2–203 (Supp. 1986); Conn. Gen. Stat. § 9–431 (1985); Del. Code Ann., Tit. 15, § 3161 (1981); Fla. Stat. § 101.021 (1985); Kan. Stat. Ann. § 25–3301 (1981); Ky. Rev. Stat. §§ 116.045, 116.055 (1982); Me. Rev. Stat. Ann., Tit. 21–A, § 141 *et seq.* (Supp. 1986–1987); Md. Ann. Code, Art. 33, § 3–8 *et seq.* (1985); Neb. Rev. Stat. § 32–530 (1984); Nev. Rev. Stat. § 293.287 (1985); N. M. Stat. Ann. § 1–4–16 (1985); N. Y. Elec. Law § 1–104.9 (McKinney 1978); N. C. Gen. Stat. § 163.74 (1982 and Supp. 1985); Okla. Stat., Tit. 26, § 1–104 (1976); Ore. Rev. Stat. § 247.201 (1985); Pa. Stat. Ann., Tit. 25, § 2832 (Purdon 1963); S. D. Codified Laws § 12–4–15 (1982); W. Va. Code § 3–1–35 (1979); Wyo. Stat. § 22–5–212 (1977).  Sixteen States allow a voter previously unaffiliated with any party to vote in a party primary if he affiliates with the party at the time of, or for the purpose of, voting in the primary.  See Ala. Code § 17–16–14(b) (1985); Ark. Stat. Ann. § 3–126 (1976); Ga. Code Ann. § 21–2–235 (1982); Ill. Rev. Stat., ch. 46, ¶ 7–43(a) (1986); Ind. Code § 3–10–1–6 (Supp. 1986); Iowa Code §§ 43.41, 43.42 (1985); Mass. Gen. Laws § 53:37 (1984); Miss. Code Ann. § 23–15–575 (1986 pamphlet); Mo. Rev. Stat. § 115.397 (1978); N. H. Rev. Stat. Ann. § 654:34II (1986); N. J. Stat. Ann. § 19:23–45 (West Supp. 1986); Ohio Rev. Code Ann. § 3513.19 (Supp. 1985); R. I. Gen. Laws § 17–9–26(c) (1981); S. C. Code §§ 7–5–120, 7–9–20 (1976 and Supp. 1985); Tenn. Code Ann. § 2–7–115(b)(2) (1985); Tex.

invokes a long and distinguished line of political scientists and public officials who have been supporters of the closed primary. But our role is not to decide whether the state legislature was acting wisely in enacting the closed primary system in 1955, or whether the Republican Party makes a mistake in seeking to depart from the practice of the past 30 years.[12]

We have previously recognized the danger that "splintered parties and unrestrained factionalism may do significant damage to the fabric of government." *Storer* v. *Brown,* 415 U. S., at 736. We upheld a California statute which denied access to the ballot to any independent candidate who had voted in a party primary or been registered as a member of a political party within one year prior to the immediately preceding primary election. We said:

> "[T]he one-year disaffiliation provision furthers the State's interest in the stability of its political system. We also consider that interest as not only permissible, but compelling and as outweighing the interest the candidate and his supporters may have in making a late

Elec. Code Ann. § 162.003 (1986). Four States provide for nonpartisan primaries in which all registered voters may participate, Alaska Stat. Ann. §§ 15.05.010, 15.25.090 (1982); La. Rev. Stat. Ann. §§ 18:401B, 18:521B (West 1979 and Supp. 1986); Va. Code § 24.1–182 (1985); Wash. Rev. Code § 29.18.200 (1965), while nine States have adopted classical "open" primaries, in which all registered voters may choose in which party primary to vote. Haw. Rev. Stat. § 12–31 (Supp. 1984); Idaho Code §§ 34–402, 34–404, 34–904 (Supp. 1986); Mich. Comp. Laws §§ 168.575, 168.576 (1967 and Supp. 1986); Minn. Stat. § 204D.08(4) (1985); Mont. Code Ann. § 13–10–301(2) (1985); N. D. Cent. Code § 16.1–11–22 (Supp. 1985); Utah Code Ann. § 20–3–19(2) (Supp. 1986); Vt. Stat. Ann., Tit. 17, § 2363 (1982); Wis. Stat. §§ 5.37, 6.80 (1983–1984).

[12] We note that appellant's direst predictions about destruction of the integrity of the election process and decay of responsible party government are not borne out by the experience of the 29 States which have chosen to permit more substantial openness in their primary systems than Connecticut has permitted heretofore.

rather than an early decision to seek independent ballot status." *Ibid.*

The statute in *Storer* was designed to protect the parties and the party system against the disorganizing effect of independent candidacies launched by unsuccessful putative party nominees. This protection, like that accorded to parties threatened by raiding in *Rosario* v. *Rockefeller*, 410 U. S. 752 (1973), is undertaken to prevent the disruption of the political parties from without, and not, as in this case, to prevent the parties from taking internal steps affecting their own process for the selection of candidates. The forms of regulation upheld in *Storer* and *Rosario* imposed certain burdens upon the protected First and Fourteenth Amendment interests of some individuals, both voters and potential candidates, in order to protect the interests of others. In the present case, the state statute is defended on the ground that it protects the integrity of the Party against the Party itself.

Under these circumstances, the views of the State, which to some extent represent the views of the one political party transiently enjoying majority power, as to the optimum methods for preserving party integrity lose much of their force. The State argues that its statute is well designed to save the Republican Party from undertaking a course of conduct destructive of its own interests. But on this point "even if the State were correct, a State, or a court, may not constitutionally substitute its own judgment for that of the Party." *Democratic Party of United States* v. *Wisconsin ex rel. La Follette*, 450 U. S., at 123–124 (footnote omitted). The Party's determination of the boundaries of its own association, and of the structure which best allows it to pursue its political goals, is protected by the Constitution. "And as is true of all expressions of First Amendment freedoms, the courts may not interfere on the ground that they view a particular expression as unwise or irrational." *Id.*, at 124.[13]

---

[13] Our holding today does not establish that state regulation of primary voting qualifications may never withstand challenge by a political party or its membership. A party seeking, for example, to open its primary to all

We conclude that the State's enforcement, under these circumstances, of its closed primary system burdens the First Amendment rights of the Party. The interests which the appellant adduces in support of the statute are insubstantial, and accordingly the statute, as applied to the Party in this case, is unconstitutional.

## IV

Appellant argues here, as in the courts below, that implementation of the Party rule would violate the Qualifications Clause of the Constitution, Art. I, § 2, cl. 1, and the Seventeenth Amendment because it would establish qualifications for voting in congressional elections which differ from the voting qualifications in elections for the more numerous house of the state legislature.[14] The Party rule as adopted permits independent voters to vote in Party primaries for the offices of United States Senator and Member of the House of Representatives, and for statewide offices, but is silent as re-

voters, including members of other parties, would raise a different combination of considerations. Under such circumstances, the effect of one party's broadening of participation would threaten other parties with the disorganization effects which the statutes in *Storer* v. *Brown*, 415 U. S. 724 (1974), and *Rosario* v. *Rockefeller*, 410 U. S. 752 (1973), were designed to prevent. We have observed on several occasions that a State may adopt a "policy of confining each voter to a single nominating act," a policy decision which is not involved in the present case. See *Anderson* v. *Celebrezze*, 460 U. S. 780, 802, n. 29 (1983); *Storer* v. *Brown, supra,* at 743. The analysis of these situations derives much from the particular facts involved. "The results of this evaluation will not be automatic; as we have recognized, there is 'no substitute for the hard judgments that must be made.'" *Anderson* v. *Celebrezze, supra,* at 789–790 (quoting *Storer* v. *Brown, supra,* at 730).

[14] Article I, § 2, cl. 1, provides: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." The Seventeenth Amendment, which provides for the direct election of United States Senators, states in pertinent part that "[t]he electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."

gards primaries held to contest nominations for seats in the state legislature. See *supra,* at 212. Appellant contends that the Qualifications Clause and the Seventeenth Amendment require an absolute symmetry of qualifications to vote in elections for Congress and the lower house of the state legislature, and that the Party rule, if implemented according to its terms, would require lesser qualifications for voting in Party primaries for federal office than for state legislative office.

The Court of Appeals rejected appellant's argument, holding that the Qualifications Clause and the parallel provision of the Seventeenth Amendment do not apply to primary elections. 770 F. 2d, at 274. The concurring opinion took a different view, reaching the conclusion that these provisions require only that "anyone who is permitted to vote for the most numerous branch of the state legislature has to be permitted to vote" in federal legislative elections. *Id.,* at 286 (Oakes, J., concurring). We agree.

We recognize that the Federal Convention, in adopting the Qualifications Clause of Article I, § 2, was not contemplating the effects of that provision upon the modern system of party primaries. As we have said:

> "We may assume that the framers of the Constitution in adopting that section, did not have specifically in mind the selection and elimination of candidates for Congress by the direct primary any more than they contemplated the application of the commerce clause to interstate telephone, telegraph and wireless communication, which are concededly within it. But in determining whether a provision of the Constitution applies to a new subject matter, it is of little significance that it is one with which the framers were not familiar. For in setting up an enduring framework of government they undertook to carry out for the indefinite future and in all the vicissitudes of the changing affairs of men, those fundamental purposes which the instrument itself discloses." *United States* v. *Classic,* 313 U. S. 299, 315–316 (1941).

The fundamental purpose underlying Article I, § 2, cl. 1, that "[t]he House of Representatives shall be composed of Members chosen . . . by the People of the several States," like the parallel provision of the Seventeenth Amendment, applies to the entire process by which federal legislators are chosen. "Where the state law has made the primary an integral part of the procedure of choice, or where in fact the primary effectively controls the choice," the requirements of Article I, § 2, cl. 1, and the Seventeenth Amendment apply to primaries as well as to general elections. *United States* v. *Classic, supra,* at 318; see *Smith* v. *Allwright,* 321 U. S. 649, 659–660 (1944). The constitutional goal of assuring that the Members of Congress are chosen by the people can only be secured if that principle is applicable to every stage in the selection process. If primaries were not subject to the requirements of the Qualifications Clauses contained in Article I, § 2 and the Seventeenth Amendment, the fundamental principle of free electoral choice would be subject to the sort of erosion these prior decisions were intended to prevent.

Accordingly, we hold that the Qualifications Clauses of Article I, § 2, and the Seventeenth Amendment are applicable to primary elections in precisely the same fashion that they apply to general congressional elections. Our task is then to discover whether, as appellant contends, those provisions require that voter qualifications, such as party membership, in primaries for federal office must be absolutely symmetrical with those pertaining to primaries for state legislative office.

Our inquiry begins with an examination of the Framers' purpose in enacting the first Qualifications Clause. It is clear that the Clause was intended to avoid the consequences of declaring a single standard for exercise of the franchise in federal elections. The state governments represented at the Convention had established varying voter qualifications, and substantial concern was expressed by delegates as to the likely effects of a federal voting qualification which disenfranchised voters eligible to vote in the States. James

Wilson argued that "[i]t would be very hard and disagreeable for the same persons, at the same time, to vote for representatives in the State Legislature, and to be excluded from a vote for those in the National Legislature." J. Madison, Journal of the Federal Convention 467 (E. Scott ed. 1893) (hereinafter Madison's Journal). Oliver Ellsworth predicted that "[t]he people will not readily subscribe to a National Constitution, if it should subject them to be disfranchised." *Id.*, at 468. Benjamin Franklin argued, in the same vein, that "[t]he sons of a substantial farmer, not being themselves freeholders, would not be pleased at being disfranchised, and there are a great many persons of that description." *Id.*, at 471. James Madison later defended the resulting provision on similar grounds:

> "To have reduced the different qualifications in the different States, to one uniform rule, would probably have been as dissatisfactory to some of the States, as it would have been difficult to the Convention. The provision made by the Convention appears therefore, to be the best that lay within their option. It must be satisfactory to every State; because it is conformable to the standard already established, or which may be established by the State itself." The Federalist No. 52, p. 354 (J. Cooke ed. 1961).

In adopting the language of Article I, §2, cl. 1, the Convention rejected the suggestion that a property qualification was necessary to restrict the availability of the federal franchise. See Madison's Journal 468–473; 2 M. Farrand, The Records of the Federal Convention of 1787, pp. 200–216 (1966). Far from being a device to limit the federal suffrage, the Qualifications Clause was intended by the Framers to prevent the mischief which would arise if state voters found themselves disqualified from participation in federal elections. The achievement of this goal does not require that qualifications for exercise of the federal franchise be at all

times precisely equivalent to the prevailing qualifications for the exercise of the franchise in a given State. The fundamental purpose of the Qualifications Clauses contained in Article I, § 2, and the Seventeenth Amendment is satisfied if all those qualified to participate in the selection of members of the more numerous branch of the state legislature are also qualified to participate in the election of Senators and Members of the House of Representatives.

Our conclusion that these provisions do not require a perfect symmetry of voter qualifications in state and federal legislative elections takes additional support from the fact that we have not previously required such absolute symmetry when the federal franchise has been expanded. In *Oregon* v. *Mitchell*, 400 U. S. 112 (1970), five Justices agreed that the Voting Rights Act Amendments of 1970 could constitutionally establish a minimum age of 18 for voters in federal elections, while a majority of the Court also concluded that Congress was without power to set such a minimum age in state and local elections. See *id.*, at 117–118 (Black, J., announcing the judgments of the Court). Appellant's reading of the Qualifications Clause, which would require identical voter qualifications in state and federal legislative elections, is plainly inconsistent with these holdings. We hold that the implementation of the Party rule does not violate the Qualifications Clause or the Seventeenth Amendment because it does not disenfranchise any voter in a federal election who is qualified to vote in a primary or general election for the more numerous house of the state legislature.

V

We conclude that § 9–431 impermissibly burdens the rights of the Party and its members protected by the First and Fourteenth Amendments. The interests asserted by appellant in defense of the statute are insubstantial. The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE SCALIA joins, dissenting.

The threshold issue presented by this case is whether, consistently with the Constitution, a State may permit a voter to participate in elections to the Congress while preventing that same person from voting for candidates to the most numerous branch of the state legislature. If we respect the plain language of Article I, § 2, cl. 1, of the Constitution and the Seventeenth Amendment, the intent of the Framers, and the reasoning of the opinions in *Oregon* v. *Mitchell*, 400 U. S. 112 (1970), we must answer that question in the negative.

Every person who votes in a federal election for a Member of the House of Representatives or for a United States Senator must be qualified to vote for candidates to the most numerous branch of the state legislature. The Constitution has imposed this condition of voter eligibility on congressional elections since 1789[1] and on senatorial elections since the Seventeenth Amendment was ratified in 1913.[2]

As the Court recognizes, *ante*, at 227, a primary election is part of the process by which Members of the House and Senate are "chosen . . . by the People." U. S. Const., Art. I, § 2, cl. 1. Cf. *United States* v. *Classic*, 313 U. S. 299, 315 (1941). In Connecticut one of the qualifications for voters in Republican Party primary elections for the lower house of the state legislature is that the person be "on the last-completed enrolment list of such party in the municipality or voting district . . . ." Conn. Gen. Stat. § 9–431 (1985). Thus, only enrolled Republicans may vote in the Republican primary for the state legislature.

---

[1] Article I, § 2, cl. 1, provides: "The House of Representatives shall be composed of Members chosen every second Year by the People of the several States, and the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature."

[2] "The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures."

The Court today holds, however, that pursuant to the Republican Party of Connecticut's rules, the State must permit independent, as well as enrolled Republican, electors to vote in the Republican primary for the House of Representatives and the Senate of the United States. This facial disparity between the qualifications for electors of House and Senate candidates and the more stringent qualifications for electors to the state legislature violates both Qualifications Clauses.

The Court does not dispute the fact that the plain language of the Constitution requires that voters in congressional and senatorial elections "shall have" the qualifications of voters in elections to the state legislature. The Court nevertheless separates the federal voter qualifications from their state counterparts, inexplicably treating the mandatory "shall have" language of the Clauses as though it means only that the federal voters "may but need not have" the qualifications of state voters. In support of this freewheeling interpretation of the Constitution, the Court relies on what it describes as the Framers' purpose in enacting the first Qualification Clause and on the judgment in *Oregon* v. *Mitchell, supra.* Neither of these arguments withstands scrutiny.

The excerpts from the debate among the Framers quoted by the Court, *ante,* at 227–229, related to a motion made by Gouverneur Morris to amend a draft of proposed Art. I, § 1, that had been prepared by the Committee on Detail. To understand the full significance of that debate it is necessary first to consider the provision that Gouverneur Morris wanted to change and then to consider the nature of his proposed amendment.

Justice Stewart accurately summarized that background in his opinion in *Oregon* v. *Mitchell, supra:*

"An early draft of the Constitution provided that the States should fix the qualifications of voters in congressional elections subject to the proviso that these qualifications might 'at any Time be altered and superseded by the Legislature of the United States.' The records of

the Committee on Detail show that it was decided to strike the provision granting to Congress the authority to set voting qualifications and to add in its stead a clause making the qualifications 'the same from Time to Time as those of the Electors, in the several States, of the most numerous Branch of their own Legislatures.' The proposed draft reported by the Committee on Detail to the Convention included the following:

"'The qualifications of the electors *shall be the same,* from time to time, as those of the electors in the several States, of the most numerous branch of their own legislatures.' Art. IV, § 1." 400 U. S., at 289 (concurring in part and dissenting in part) (footnotes omitted; emphasis added).

Thus, the draft that the Federal Convention of 1787 was considering when Gouverneur Morris made his motion was abundantly clear—the qualifications of the federal electors "shall be the same" as the electors of the legislatures of the several States. J. Madison, Journal of the Federal Convention 449–450 (E. Scott ed. 1893). This provision would ensure uniformity of electors' qualifications within each State, but would not impose a uniform nationwide standard.[3]

It was this clause that Gouverneur Morris proposed to strike in order to substitute a clause permitting Congress to prescribe the electoral qualifications or to adopt a provision "which would restrain the right of suffrage to freeholders." *Id.,* at 467. Not surprisingly, his proposal was defeated by a vote of 7 to 1 because it would have disenfranchised a large number of voters in States that did not impose a property qualification on the right to vote. *Id.,* at 467, 468, 471–472. Despite the Court's reliance on the concerns that led the

---

[3] James Wilson referred to this part of the Report of the Committee on Detail as "well considered," and "he did not think it could be changed for the better. It was difficult to form any uniform rule of qualifications, for all the States." J. Madison, Journal of the Federal Convention 467 (E. Scott ed. 1893).

Framers to reject the Morris proposal, they shed absolutely no light on the reasons why the Committee on Detail had previously decided that the voters' qualifications in state and federal elections "shall be the same."

The Court's reliance on the holding in *Oregon* v. *Mitchell* is equally misguided. That case tested the constitutionality of certain parts of the Voting Rights Act Amendments of 1970, 84 Stat. 314, including the section that lowered the minimum age of voters in both state and federal elections from 21 to 18. Four Members of the Court concluded that Congress had no such power;[4] four other Members of the Court concluded that the entire statute was valid.[5] Thus, the conclusions of all eight of those Justices were consistent with the proposition that the Constitution requires the same qualifications for state and federal elections.[6] Only Justice Black concluded that the statute was invalid insofar as it applied to state elections but valid insofar as it applied to federal elections. 400 U. S., at 125–130.

Even Justice Black's reasoning, however, supports a literal reading of the Qualifications Clause in the absence of a federal statute prescribing a different rule for federal elections. For he relied entirely on the provision in Art. I, § 4, that empowers Congress to alter a State's regulations concerning the times, places, and manner of holding elections for Senators and Representatives. 400 U. S., at 119–124. In Justice

---

[4] See opinion of Justice Harlan, 400 U. S., at 152, 212–213 (concurring in part and dissenting in part), and opinion of Justice Stewart, *id.*, at 281, 287–289 (joined by Burger, C. J., and BLACKMUN, J.).

[5] See opinion of Justice Douglas, *id.*, at 135, 141–144, and the joint opinion, *id.*, at 229, 280–281 (opinion of BRENNAN, WHITE, and MARSHALL, JJ.).

[6] This was certainly the view of Justice Harlan, see *id.*, at 210–211, and of Justice Stewart and the two Justices who joined his opinion, see *id.*, at 287–290. As Justice Stewart observed: "The Constitution thus adopts as the federal standard the standard which each State has chosen for itself." *Id.*, at 288. The opinions of Justice Douglas and JUSTICE BRENNAN are silent on the issue.

Black's opinion, the qualifications that the States prescribed for their own voters for state offices "were adopted for federal offices unless Congress directs otherwise under Art. I, § 4." *Id.*, at 125.

In this case there is no federal statute that purports to authorize the State of Connecticut to prescribe different qualifications for state and federal elections. Thus, there is no authority whatsoever for the Court's refusal to honor the plain language of the Qualifications Clauses. An interpretation of that language linking federal voters' qualifications in each State to the States' existing qualifications exactly matches James Madison's understanding:

> "The provision made by the Convention appears therefore, to be the best that lay within their option. It must be satisfactory to every State; because it is conformable to the standard already established, or which may be established by the State itself." The Federalist No. 52, p. 354 (J. Cooke ed. 1961).

I respectfully dissent.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

Both the right of free political association and the State's authority to establish arrangements that assure fair and effective party participation in the election process are essential to democratic government. Our cases make it clear that the accommodation of these two vital interests does not lend itself to bright-line rules but requires careful inquiry into the extent to which the one or the other interest is inordinately impaired under the facts of the particular case. See *Anderson* v. *Celebrezze*, 460 U. S. 780, 788–790 (1983); *Storer* v. *Brown*, 415 U. S. 724, 730 (1974). Even so, the conclusion reached on the individuated facts of one case sheds some measure of light upon the conclusion that will be reached on the individuated facts of the next. Since this is an area, moreover, in which the predictability of decisions is impor-

tant, I think it worth noting that for me today's decision already exceeds the permissible limit of First Amendment restrictions upon the States' ordering of elections.

In my view, the Court's opinion exaggerates the importance of the associational interest at issue, if indeed it does not see one where none exists. There is no question here of restricting the Republican Party's ability to recruit and enroll Party members by offering them the ability to select Party candidates; Conn. Gen. Stat. § 9–56 (1985) permits an independent voter to join the Party as late as the day before the primary. Cf. *Kusper* v. *Pontikes*, 414 U. S. 51 (1973). Nor is there any question of restricting the ability of the Party's members to select whatever candidate they desire. Appellees' only complaint is that the Party cannot leave the selection of its candidate to persons who are *not* members of the Party, and are unwilling to become members. It seems to me fanciful to refer to this as an interest in freedom of association between the members of the Republican Party and the putative independent voters. The Connecticut voter who, while steadfastly refusing to register as a Republican, casts a vote in the Republican primary, forms no more meaningful an "association" with the Party than does the independent or the registered Democrat who responds to questions by a Republican Party pollster. If the concept of freedom of association is extended to such casual contacts, it ceases to be of any analytic use. See *Democratic Party of United States* v. *Wisconsin ex rel. La Follette*, 450 U. S. 107, 130–131 (1981) (POWELL, J., dissenting) ("[Not] every conflict between state law and party rules concerning participation in the nomination process creates a burden on associational rights"; one must "look closely at the nature of the intrusion, in light of the nature of the association involved, to see whether we are presented with a real limitation on First Amendment freedoms").

The ability of the members of the Republican Party to select their own candidate, on the other hand, unquestionably

implicates an associational freedom—but it can hardly be thought that that freedom is unconstitutionally impaired here. The Party is entirely free to put forward, if it wishes, that candidate who has the highest degree of support among Party members and independents combined. The State is under no obligation, however, to let its party primary be used, instead of a party-funded opinion poll, as the means by which the party identifies the relative popularity of its potential candidates among independents. Nor is there any reason apparent to me why the State cannot insist that this decision to support what might be called the independents' choice be taken *by the party membership in a democratic fashion*, rather than through a process that permits the members' votes to be diluted—and perhaps even absolutely outnumbered—by the votes of outsiders.

The Court's opinion characterizes this, disparagingly, as an attempt to "protec[t] the integrity of the Party against the Party itself." *Ante*, at 224. There are two problems with this characterization. The first, and less important, is that it is not true. We have no way of knowing that a majority of the Party's members is in favor of allowing ultimate selection of its candidates for federal and statewide office to be determined by persons outside the Party. That decision was not made by democratic ballot, but by the Party's state convention—which, for all we know, may have been dominated by officeholders and office seekers whose evaluation of the merits of assuring election of the Party's candidates, vis-à-vis the merits of proposing candidates faithful to the Party's political philosophy, diverged significantly from the views of the Party's rank and file. I had always thought it was a major purpose of state-imposed party primary requirements to protect the general party membership against this sort of minority control. See *Nader* v. *Schaffer*, 417 F. Supp. 837, 843 (Conn.), summarily aff'd, 429 U. S. 989 (1976). Second and more important, however, *even if* it were the fact that the majority of the Party's members wanted its candidates to be

determined by outsiders, there is no reason why the State is bound to honor that desire—any more than it would be bound to honor a party's democratically expressed desire that its candidates henceforth be selected by convention rather than by primary, or by the party's executive committee in a smoke-filled room. In other words, the validity of the state-imposed primary requirement itself, which we have hitherto considered "too plain for argument," *American Party of Texas* v. *White*, 415 U. S. 767, 781 (1974), presupposes that the State *has* the right "to protect the Party against the Party itself." Connecticut may lawfully require that significant elements of the democratic election process be democratic—whether the Party wants that or not. It is beyond my understanding why the Republican Party's delegation of its democratic choice to a Republican Convention can be proscribed, but its delegation of that choice to nonmembers of the Party cannot.

In the case before us, Connecticut has said no more than this: Just as the Republican Party may, if it wishes, nominate the candidate recommended by the Party's executive committee, so long as its members select that candidate by name in a democratic vote; so also it may nominate the independents' choice, so long as its members select him by name in a democratic vote. That seems to me plainly and entirely constitutional.

I respectfully dissent.