# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 10, 2012        Decided June 8, 2012

No. 11-7029

LIBERTARIAN PARTY, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS,
ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01676)

*Oliver B. Hall* argued the cause and filed the briefs for appellants.

*Rudolph M.D. McGann* argued the cause and filed the brief for appellee District of Columbia Board of Elections and Ethics. *Kenneth J. McGhie* entered an appearance.

*James C. McKay Jr.*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees Vincent C. Gray and Irvin B. Nathan. With him on the brief were *Irvin B. Nathan*, Attorney

General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

Before: TATEL, GARLAND, and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: The District of Columbia's Board of Elections and Ethics published the total number of write-in votes cast in the 2008 presidential election but, consistent with its regulations, never reported which individuals were penciled in by voters choosing the write-in option or how many votes any such individual accrued. The Libertarian Party, along with its 2008 presidential candidate Bob Barr, a write-in candidate, contends that the District's failure to report the number of votes cast for Barr violates the First and Fifth Amendments. The district court granted the Board's motion for summary judgment. For the reasons set forth in this opinion, we affirm.

**I.**

Bob Barr was listed on the ballots of forty-five states and qualified as a write-in candidate in one other. He also qualified as a write-in candidate in the District of Columbia. District voters could either vote for a ballot candidate, such as John McCain or Barack Obama, or they could opt to pencil in a vote for Bob Barr or one of the other write-in candidates. Of the 265,853 votes cast, 245,800 went to the future president, Barack Obama, and of the remaining 20,053 votes, a total of 1,138 were counted as votes for write-in candidates. The D.C. Board of Elections and Ethics tallied and reported all of these votes, including the 1,138 write-in votes, as required by its rules. *See* D.C. Mun. Regs. tit. 3, § 806.12. But because the "total number of write-in votes" was not "sufficient to elect a

write-in candidate," *id.* § 806.13, the Board, pursuant to section 806.13 of its rules, did not individually tally and report the total number of votes cast for Barr or any other write-in candidate. The Libertarian Party, Bob Barr, and several citizens who voted for Barr sued in the United States District Court for the District of Columbia, alleging that the Board's failure to do so violated their First Amendment speech and associational rights and their Fifth Amendment equal protection rights. Throughout this opinion, we shall refer to the plaintiffs as "the Party."

The district court granted summary judgment for the Board. After observing that whether speech and associational rights "extend to the manner in which votes are reported is a close question," the district court determined that it had no need to resolve the issue because "when an election law imposes only 'reasonable, nondiscriminatory restrictions' upon the constitutional rights of voters, 'the State's important regulatory interests are generally sufficient to justify the restrictions.' " *Libertarian Party v. D.C. Bd. of Elections & Ethics*, 768 F. Supp. 2d 174, 180, 181–82 (D.D.C. 2011) (quoting *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). The district court concluded that "[t]he burden Section 806.13 puts on Plaintiffs' constitutional rights is accordingly very limited," and here, "the District's regulatory interests trump Plaintiffs' limited interest in having write-in votes tabulated and reported on a candidate-by-candidate basis." *Id.* at 187.

The Party now appeals, and our review is de novo. *See, e.g.*, *Maydak v. United States*, 630 F.3d 166, 174 (D.C. Cir. 2010).

## II.

The Supreme Court's decision in *Burdick v. Takushi*, 504 U.S. 428, provides the framework for our analysis. There, the Court explained that "[e]lection laws will invariably impose some burden upon individual voters," and that not all laws burdening the right to vote are subject to strict scrutiny. *Id.* at 433–34. Rather, as explained in *Anderson v. Celebrezze*, courts must "consider the character and magnitude of the asserted injury" to the plaintiff's constitutional right, as well as "the precise interests put forward by the State as justifications for the burden imposed by its rule." 460 U.S. 780, 789 (1983). When a voter's rights are "subjected to severe restrictions, the regulation must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434 (internal quotation marks omitted). But when election laws impose only "reasonable, nondiscriminatory restrictions" upon the constitutional rights of voters, "the State's important regulatory interests are generally sufficient to justify the restrictions." *Id.* (internal quotation marks omitted). The question, then, is whether the District's regulations impose "severe restrictions" on the Party's constitutional rights and are thus subject to strict scrutiny (as the Party argues), or whether they impose "reasonable, nondiscriminatory restrictions" and are thus permissible in light of the District's "important regulatory interests" (as the district court found).

Acknowledging that the Supreme Court in *Burdick* upheld Hawaii's outright ban on write-in voting, the Party argues that the Court only did so in the context of Hawaii's particular statutory scheme, which provides candidates with "easy access to the ballot." Appellants' Br. 11. By contrast, the Party points out that the District, unlike Hawaii, requires that candidates seeking to appear on the general election ballot submit a nomination petition signed by one percent of

all registered voters. D.C. Code § 1-1001.08(f). The Party does not challenge this requirement. Instead, it argues that in light of the burden the District imposes on candidates seeking access to the ballot, the Board's unwillingness to count and report the number of votes cast for each individual write-in candidate "severe[ly]" burdens the Party's constitutional rights. Appellants' Br. 14. It does so, the Party argues, by burdening " 'the right of qualified voters, regardless of their political persuasion, to cast their votes effectively,' " as well as the " 'right of individuals to associate for the advancement of political beliefs.' " *Id.* at 19 (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). Elaborating, the Party explains:

> [A] voter who casts a valid write-in ballot for a declared candidate like Barr is entitled to know whether she has acted in concert with other like-minded voters or whether her vote is a lone statement in the political wilderness. The voting public is entitled to know how Barr fared at the polls. The Libertarian Party is entitled to know whether its stature has grown or been diminished by the votes cast for Barr. None of this vital information, laden with associative and communicative value, is available if the Board fails to count and report the Barr vote.

*Id.* at 19–20. Finally, the Party points to case law recognizing that each voter's vote "must be correctly counted and reported." *Gray v. Sanders*, 372 U.S. 368, 380 (1963).

The District's laws no doubt impose burdens on write-in candidates, but, like the district court, we have no basis for concluding that these burdens are "severe," or anything but "reasonable [and] nondiscriminatory." *Libertarian Party*, 768 F. Supp. 2d at 181 (internal quotation marks omitted). The Party nowhere disputes that its members were perfectly free to associate, to campaign freely and zealously, to mobilize

supporters, and to vote as they wished. Nor does it dispute that the Board accurately counted all votes, including the write-in votes, or that the Board reported the number of votes for the named candidates, as well as the number of votes cast for the write-in option in general. Yet it insists that the Board "effectively disenfranchises . . . registered District of Columbia voter[s] who cast a valid write-in vote for plaintiff Barr in the 2008 presidential election." Appellants' Br. 17. We fail to see how. They were free to vote. They voted. The number of write-in votes was counted. The Party knows it "received between 3 and 1,138 votes out of a total 265,853 votes cast—at most, less than 0.5 percent of the total vote." *Libertarian Party*, 768 F. Supp. 2d at 186. And, as the district court pointed out, "their votes would have been further tabulated on a candidate-by-candidate basis, pursuant to Section 806.13, if there had been a sufficient number of write-ins to have a determinative effect on the election." *Id.* at 185. In the context of an election, like this one, where write-in votes could have no possible effect on the outcome, the District's refusal to tally and report the precise number of voters who penciled in Bob Barr as their candidate of choice hardly amounts to disenfranchising those voters or, more precisely for our purposes, imposing a severe burden on their rights. Of course, the Party would benefit from knowing how many people voted for its candidate. And it seems reasonable to think that having such information may facilitate further and future speech and association. But that alone does not render the regulation a severe burden. It just makes the regulation inconvenient for candidates unable to obtain signatures from one percent of District voters in advance of the election.

Arguing otherwise, the Party contends that a precise count is necessary because under federal law, 26 U.S.C. § 9004, a minor party presidential candidate polling at least

five percent of the national vote can qualify for public funding in the next election. But as the district court pointed out, "[e]ven if all 1,138 write-in votes from the District of Columbia were allotted to Barr, his vote total would still be approximately 0.40%—nowhere near the 5% threshold required for public funding." *Libertarian Party*, 768 F. Supp. 2d at 187. Thus, any such harm is, at least in this case, purely hypothetical.

Indeed, the District's regime is no stricter and no more severe than the one in Hawaii upheld by the Supreme Court in *Burdick*. There, Hawaii banned write-in voting and required candidates to run in an open primary in order to appear on the general election ballot. *Burdick*, 504 U.S. at 435. A nonpartisan candidate could get on the primary ballot by filing paperwork containing, depending on the office sought, fifteen to twenty-five signatures, but could only advance to the general election by receiving either ten percent of the primary vote or the number of votes that would have allowed the nonpartisan candidate to be nominated had she run as a partisan candidate. *Id.* at 436. By contrast, a partisan candidate—including one outside the major parties—was required to file a party petition containing the signatures of one percent of the state's registered voters. *Id.* at 435. In holding that Hawaii's election scheme did not constitute a severe burden, the Court explained that it had "previously upheld party and candidate petition signature requirements that were as burdensome or more burdensome than Hawaii's one-percent requirement." *Id.* at 435 n.3. Given this, we cannot see how the District's regulations—which, unlike Hawaii's, allow voters to write in a candidate of choice, and which provide for the counting and reporting of the total number of write-ins, though not how many votes each individual write-in candidate received—can be considered a severe burden.

Although we certainly understand why the Party is interested in the ballot count for reasons other than figuring out who won the election, so too was the plaintiff in *Burdick* who sued because he wanted to register a protest vote for Donald Duck. *See id.* at 438. As the Supreme Court put it, "the function of the election process is to winnow out and finally reject all but the chosen candidates, not to provide a means of giving vent to short-range political goals." *Id.* (citation and internal quotation marks omitted). Accordingly, "[a]ttributing to elections a more generalized expressive function would undermine the ability of States to operate elections fairly and efficiently." *Id.* Likewise, in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997), the Supreme Court rejected a challenge to the constitutionality of Minnesota's law prohibiting candidates from appearing on the ballot as the candidate of more than one party. In doing so, the Court explained that it was "unpersuaded . . . by the party's contention that it has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate. Ballots serve primarily to elect candidates, not as forums for political expression." *Id.* at 363.

Moreover, any burden imposed is to some extent mitigated by the District's Freedom of Information Act, which provides that "[a]ny person has a right to inspect . . . any public record of a public body," D.C. Code § 2-532(a), and expressly defines the term "public record" to include "vote data (including ballot-definition material, raw data, and ballot images)," *id.* § 2-502(18). Invoking this law, the Party, as the Board emphasized at oral argument, can obtain the ballots and count exactly how many were cast for Bob Barr. To be sure, like any other FOIA request, this would cost the Party some time and resources. Thus, what is really at

stake here is the allocation of cost—whether the Board has to manually count every write-in vote, even when the write-in votes could not possibly affect the election's outcome, or whether it is sufficient for the Board to count and report the total number of write-in votes, determine that they are irrelevant to the outcome, and leave interested parties free to rummage through the ballots and count specifically how many votes their write-in candidate received.

Because the Party has failed to show that the District's law places a severe burden on its rights, the District's " 'important regulatory interests are generally sufficient to justify' the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). Here, in elections where a write-in candidate could not possibly be declared the victor, the District seeks to avoid the needless cost of tabulating each write-in ballot by hand. As a declaration from the Board's Executive Director states, the write-in ballots would have to be sorted from the hundreds of thousands of ballots cast and manually counted, an undertaking that would require D.C. to hire and train employees for a task that would "require at least a few weeks to complete." Decl. of Rokey Suleman ¶¶ 5–6. The Party does not contest this declaration. Instead, it cites cases like *Dunn v. Blumstein*, where the Court explained that "states may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State." 405 U.S. 330, 351 (1972) (internal quotation marks omitted). But in *Dunn* and the other cases cited by the Party, the Court was applying strict scrutiny because the states had actually disenfranchised a segment of voters. In *Dunn*, the Court invalidated a "durational residence requirement," 405 U.S. at 338, and in *Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986), it struck down a law that had banned political parties from allowing independent voters to vote in their primary. In such instances—where voting is literally

prohibited—mere administrative costs are insufficient to survive strict scrutiny. In a case like this, however, where the challenged regulation imposes no severe burden, strict scrutiny has no place and the District's general regulatory interests are sufficient to uphold its law.

## III.

We affirm the judgment of the district court.

*So ordered.*