Bob GEARY, Robert Silvestri, Dennis Mark, Melissa Gundrun, Wayne Johnson, David Soule, Max Woods, Peter Johnson, Robert Gebert, Election Action, Terence Faulkner, and Sudi Trippet, Plaintiffs–Appellees,

v.

Louise RENNE, San Francisco City Attorney, Dianne Feinstein, San Francisco Mayor, Board of Supervisors, City and County of San Francisco, City and County of San Francisco, and Jay Patterson, San Francisco Registrar of Voters, Defendants–Appellants.

No. 88–2875.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 16, 1988.

Decided July 24, 1989.

Dennis Aftergut, San Francisco, Cal., for defendants-appellants.

Arlo H. Smith, San Francisco, Cal., for plaintiffs-appellees.

Before SNEED, CANBY and TROTT, Circuit Judges.

TROTT, Circuit Judge:

On June 3, 1986, the people of California amended their constitution to add the following provision as article II, § 6(b):

No political party or party central committee may endorse, support or oppose a candidate for nonpartisan office.[1]

In this appeal, we are asked to decide (1) whether this provision is compatible with First Amendment rights of free speech and association, and (2) whether it deprives the individuals and political entities to which it applies of equal protection of the laws as guaranteed by the Fourteenth Amendment. We hold on both counts that the provision is consonant with the United States Constitution, and in so doing we reverse the judgment of the district court.

## I

Plaintiffs-appellees in this case are ten registered voters of the City and County of San Francisco, an organization of registered voters, and an officer of that organization. The basis of their complaint as it relates to this appeal was the refusal of defendants-appellants, the City and County of San Francisco and the San Francisco Registrar of Voters, to permit official political party and party central committee endorsements of candidates for nonpartisan offices to be printed in the San Francisco Voter Pamphlet in connection with elections scheduled for June 2 and November 3, 1987. Defendants-appellants based their refusal to print party endorsements on the language of article II, § 6(b).

Plaintiffs-appellees alleged that article II, § 6(b) violates the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1985. In particular, they claimed that this provision of California's Constitution abridges their individual and collective rights of free speech and association and denies them equal protection under the law. The district court partially granted plaintiffs' motion for summary judgment and entered judgment on their behalf.[2] 708 F.Supp. 278.

The City of San Francisco then moved to vacate the court's judgment.[3] On June 9, 1988, the district court denied the motion, and this expedited appeal followed. We have jurisdiction under 28 U.S.C. § 1291, and we review *de novo* the grant of summary judgment. *See Darring v. Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986).

## II

Subsection (b) of article II, § 6 represents a direct response of the people of

---

**1.** Section 35 of the California Elections Code defines "political party" to include those parties that have qualified for the state's primary ballot: the Democratic Party (Cal. Elections Code §§ 8500–8945), the Republican Party (Cal. Elections Code §§ 9000–9510), the American Independent Party (Cal. Elections Code §§ 9600–9745), and the Peace and Freedom Party (Cal. Elections Code §§ 9750–9855). Plaintiffs-appellees argue that Article II, § 6(b) covers all political parties, not just those that are ballot qualified. We disagree, but even if we were to accept this contention, our analysis of the issues in this case would be the same.

**2.** In its Order Partially Granting Plaintiffs' Motion for Summary Judgment and Directing Entry of a Final Judgment, the district court made the following statements:

While the State of California may have a legitimate interest in maintaining the nonpartisan character of local, judicial, and school elections, Article II, Section 6(b) of the California Constitution is not a narrowly drafted enactment designed to advance such interest by the least drastic means. On the contrary, California can adequately safeguard such in-

terests by providing for nonpartisan methods of nomination of candidates for such offices and by controlling partisan activities of the candidates—for example, by prohibiting candidates for such offices from soliciting or collecting campaign funds from political parties. Indeed, it appears that California has already taken steps in this direction by adopting nonpartisan nomination methods for all local, school, and judicial offices. See e.g. Cal.Elec.Code Secs. 6400 et seq., 22600 et seq., and 23500 et seq.; Cal. Const., Art. VI, Sec. 16; San Francisco Charter Secs. 9.100–1 and 9.104.

Furthermore, defendants have not made any showing why California has a compelling interest in suppressing endorsements or discussion of candidates for local, school and judicial offices, by political parties and their central committes, but permitting such advocacy and endorsements by other groups, including partisan organizations and special interest groups.

**3.** By order of this court filed on September 21, 1988, the judgment of the district court was stayed pending further order of this court.

California to a 1984 decision of their Supreme Court, *Unger v. Superior Court*, 37 Cal.3d 612, 692 P.2d 238, 209 Cal.Rptr. 474 (1984). (*Unger*). At the time *Unger* was decided, article II, § 6 read simply: "Judicial, school, county and city offices shall be nonpartisan."[4] "Nonpartisan offices" were—and still are—defined as "office[s] for which no party may nominate a candidate." Cal. Elections Code § 37. The issue before the court in *Unger* was whether this provision barred the Republican Party from endorsing the "nonconfirmation" of the three justices in the 1982 General Election.[5] In an opinion in which four justices, including the current Chief Justice, wrote separately, a divided *Unger* Court held that article II, § 6, as it then read, did not prohibit a political party or its governing body from "endorsing, supporting, or opposing candidates for nonpartisan office." *Unger*, 37 Cal.3d at 615, 692 P.2d at 240, 209 Cal.Rptr. at 476.[6] Justice Sims, in dissent, wrote a lengthy opinion in which he meticulously surveyed the historical background of California's nonpartisan political traditions. He also discussed at length the First Amendment implications of this issue, as did Acting Chief Justice Grodin in a separate concurrence.

In 1986, Assemblyman Richard Mountjoy, a member of the California Assembly since 1978, sought to reverse the effect of *Unger* by introducing Assembly Constitutional Amendment 7. This amendment proposed adding subsection (b) to article II, § 6. After successfully wending its way through the legislative process as provided in article XVIII, §§ 1 and 4 of California's Constitution, this remedial proposal was submitted to the people as Proposition 49 on the June 1986 ballot. The voters approved it by a vote of 2,292,678 to 1,805,305.[7]

## III

■ To evaluate a constitutional challenge to an election law, we must first consider the character and magnitude of the injury to First Amendment rights allegedly presented by the law. *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983) (*Anderson*). We then determine whether or not the interests cited by the state to justify this injury are compelling and the "extent to which [they make] it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570, *Eu v. San Francisco County Democratic Central Committee*, —— U.S. ——, 109 S.Ct. 1013, 1019, 103 L.Ed.2d 271 (1989), *aff'g* 826 F.2d 814 (9th Cir.1987) (citations omitted) (*Eu*). Finally, we must establish whether the law in question is narrowly tailored to serve the specified interest. *Id.*

This method of analyzing the proper judicial response to a constitutional challenge to an election law is useful in helping us to identify the constitutional and policy considerations that compete in such cases. Application of this method does not, however, automatically produce a decision. In the end, there is "'no substitute for the hard judgments that must be made.'" *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570 (citation omitted). We do not wish to

4. As part of the ballot proposition that added § 6(b) to the California Constitution, § 6 was renumbered as § 6(a) and the word "all" was added as a qualifier to the offices described therein.

5. For a detailed study of events and controversy attending recent confirmation elections of the Justices of the California Supreme Court, *see* Uelman, *California Judicial Retention Elections,* 28 Santa Clara L.Rev. 333 (1988).

6. Although the general election of November 1982 with which this lawsuit was concerned had already taken place by the time of the California Supreme Court's decision in *Unger,* the Court

decided the case in any event, noting with considerable clairvoyance that "the issues raised are of general public interest and will likely recur in future elections." We note that the controversy over partisan involvement in elections continues unabated, this lawsuit being but one example.

7. Of the 58 counties in California, Proposition 49 carried in 55. The three counties in which it failed to carry were Alameda, Los Angeles and San Francisco. The overall percentage of the vote was 55.9% for; 44.1% against. Statement of Vote, June 3, 1986 Primary Election (on file at U.S. Circuit Court Library, San Francisco, California).

pretend that our common sense and experience have no influence on our attempt to balance First Amendment and state interest considerations in the context of section 6(b).

## IV

There can be no doubt that article II, § 6(b) constitutes a substantial limitation on the First Amendment rights of party members both to associate and to speak publicly and collectively regarding the qualifications of persons running for significant public offices. Political expression, in general, and speech uttered during a campaign for political office, in particular, enjoy the broadest protection of the First Amendment. *See Eu,* 109 S.Ct. at 1020; *Buckley v. Valeo,* 424 U.S. 1, 14, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) *(Buckley).* Moreover, "any interference with the freedom of a [political] party is simultaneously an interference with the freedom of its adherents." *Sweezy v. New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1211, 1 L.Ed.2d 1311 (1957) *(Sweezy); Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 215, 107 S.Ct. 544, 549, 93 L.Ed.2d 514 (1986) *(Tashjian); Eu,* 109 S.Ct. at 1016; *see also NAACP v. Button,* 371 U.S. 415, 438–39, 83 S.Ct. 328, 340–41, 9 L.Ed.2d 405 (1963). These rulings apply to state laws through the Fourteenth Amendment. *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 461, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488 (1958)("It is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.").

Section 6(b)'s prohibition against party support for or opposition to a nonpartisan candidate also raises First Amendment concerns. The Court has held that conduct and communication are essentially indistinguishable in this context. *See Buckley,* 424 U.S. at 19, 96 S.Ct. at 634 ("[A] restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quality of expression by restructuring the number of issues discussed, the depth of their exploration, and the size of the audience reached.").

Insofar as article II, § 6(b) limits political expression and association, it imposes a type of restriction whose constitutionality is suspect. We must therefore examine Section 6(b) with exacting scrutiny as we seek to determine whether on balance it is compatible with First Amendment values. *Eu,* 109 S.Ct. at 1020–21; *Brown v. Hartlage,* 456 U.S. 45, 52–53, 102 S.Ct. 1523, 1528–29, 71 L.Ed.2d 732 (1982) *(Brown).*

Despite the fact that section 6(b) limits highly protected expression, four factors mitigate its offensiveness to the Constitution. These redeeming features of section 6(b) are as follows:

(1) It expands rather than constricts the political process, avoiding a concentration of power in the dominant political parties.

(2) It applies only to a limited number of organizations, leaving individuals and an unlimited number of other groups, ad hoc or otherwise, to speak, endorse, or support as they please.

(3) It pertains to carefully selected intrastate nonpartisan offices, not offices of national scope.

(4) Its limitation on First Amendment activities compares favorably with other similar restrictions previously approved by the Supreme Court.

We discuss each of these features in turn.

1. *Section 6(b) Expands the Political Process*

We take the view that a restriction on political speech such as section 6(b), whose dominant effect is to open the process to more diverse interests, groups, and individuals, or to prevent the political process from becoming clogged and unworkable, inflicts a less severe injury on peoples' First Amendment rights than does a restriction that leads to a concentration of political power. This view finds ample support in Supreme Court opinions. Those cases striking down restrictions on political expression often base their decisions on the

need for an open political process that will accommodate a variety of groups and interests. In *Anderson,* for example, the Court justified its decision to strike down Ohio's early filing deadline for statements of candidacy on the grounds that it unfairly burdened new or small political parties and independent candidates. *See* 460 U.S. at 789, 103 S.Ct. at 1570 ("By limiting the opportunities of independent-minded voters to associate in the electoral arena to enhance their political effectiveness as a group, such restrictions threaten to reduce diversity and competition in the marketplace of ideas. Historically, political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream.")(citations omitted); *see also Storer v. Brown,* 415 U.S. 724, 729, 94 S.Ct. 1274, 1278, 39 L.Ed. 2d 714 (1974) (warning against regulations that "confer an effective political monopoly on the two major political parties") *(Storer), Sweezy,* 354 U.S. at 251, 77 S.Ct. at 1212 ("All political ideas cannot and should not be channeled into the programs of our two major parties. History has amply proved the virtue of political activity by minority, dissident groups, who innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted.").

By contrast, in cases that uphold the constitutionality of restrictions on political expression the Court often grounds its judgments on the fact that the limitation does *not* restrict access to the political arena, or is necessary to preserve the integrity of the electoral process. In *Jenness v. Fortson,* for example, the Court upheld the constitutionality of Georgia's filing deadlines because "[u]nlike Ohio's, [Georgia's election laws] do not operate to freeze the political status quo." 403 U.S. 431, 438–

39, 91 S.Ct. 1970, 1974–75, 29 L.Ed.2d 554 (1971) *(Jenness); see also Storer,* 415 U.S. at 730–33, 94 S.Ct. at 1279–80 ("The requirement that the independent candidate not have been affiliated with a political party for a year before the primary is expressive of a general state policy aimed at maintaining the integrity of various routes to the ballot. It involves no discrimination against independents.").

In a sense, section 6(b) simply prevents political parties as such from dominating an area designed to remain open to everyone. It promotes the vitality and fluidity of the political process rather than setting it in concrete. Section 6(b) is the type of law the Court regarded favorably in *Anderson* and *Sweezy.* This interpretation of section 6(b) depends, of course, on the legitimacy of the judgment endorsed by California's electorate that permitting partisan political parties, with all their wealth, power, and expertise, to move into the nonpartisan arena necessarily operates to restrict the room that is now available there to members of nonqualified parties and candidates who are truly independent. We will discuss this judgment, and its basis in California's history, later in this opinion.

### 2. *Section 6(b) Does Not Unnecessarily Restrict Political Debate*

The magnitude of the injury imposed by section 6(b) is diminished by the fact that this provision governs the activities of organizations, not individuals: It keeps no natural person in California from the ballot, and it prevents no such person from supporting, endorsing, opposing, or voting for the candidate of his or her choice. *Sweezy,* 354 U.S. at 250, 77 S.Ct. at 1211, *Tashjian,* 479 U.S. at 215, 107 S.Ct. at 549, and *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)[8] notwithstanding, we

---

**8.** In *First National Bank of Boston v. Bellotti,* the Court observed that "[t]he court below framed the principal question in this case as whether and to what extent corporations "have" First Amendment rights. We believe that the court posed the wrong question. The Constitution often protects interests broader than those of the party seeking their vindication. The First Amendment, in particular serves significant societal interests. The proper question therefore is not whether corporations "have" rights and, if so, whether they are coextensive with those of natural persons. Instead, the questions must be whether [the limitation complained of] abridges expression that the First Amendment was meant to protect." 435 U.S. at 775–76, 98 S.Ct. at

see this as an important distinction in analyzing the character and magnitude of the assessed injury in this case. The distinction both ameliorates the character and diminishes the magnitude of the injury under examination. Any member of any political party or central committee in California, or any group of members (ad hoc or otherwise), is free to endorse, support, or oppose any candidate for nonpartisan office so long as the individual or group does not purport to speak or act for the party. Similarly, any such individual may run for any of the nonpartisan offices in question, even though he himself is closely identified with a political party or even the chairman of its central committee. In addition, and importantly, article II, § 6(b) does not "censor[ ] the political speech a party shares with its [own] members," "prevent[ ] party governing bodies from stating whether a [partisan] candidate adheres to the tenets of the party ...," "[n]or hamstring[ ] voters seeking to inform themselves about the [party's] candidates and the campaign issues." *Eu*, 109 S.Ct. at 1020. We see these points as major distinctions between this case and *Eu*. In sum, we do not see Section 6(b)'s impact on political debate as draconian.

### 3. *Section 6(b) Concerns Only Intrastate Nonpartisan Offices*

The weightiness of section 6(b)'s infringement on free speech on the scale of constitutional injuries is also lessened by the character of the elections and offices that fall within its scope. The elections to which section 6(b) applies are statewide or local elections. The winners of section 6(b) contests do not generally travel to Washington, D.C. or to national party conventions—they tend to stay at home and contend with the problems of their respective states or municipalities. In *Anderson*, the Court found the state's interest in regulating matters of statewide or local interest to be more compelling than its interest in regulating national elections. 460 U.S. at 795, 103 S.Ct. at 1573 ("[T]he State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the state's boundaries.... The Ohio filing deadline challenged in this case does more than burden the associational rights of independent voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process."). *See also Cousins v. Wigoda*, 419 U.S. 477, 483, 95 S.Ct. 541, 545, 42 L.Ed.2d 595 (1975) ("[c]onsideration of the special function of delegates to ... a [National Party] Convention militates persuasively against the conclusion that the asserted interest constitutes a compelling state interest."). Moreover, our Constitution reflects the judgment that it is important to exempt judges from the sphere of political influence. *See* U.S. Const., article II, § 2 and article III, § 1. We see no reason why this proposition should not apply to state judges with equal force. Although these observations—including the priority we afford to removing judicial decisions from political influence—go primarily to the compelling interest of the state test, they are also relevant to the character and magnitude of the asserted injury.

### 4. *Section 6(b) Compares Favorably With Similar First Amendment Restrictions*

The asserted injury that section 6(b) inflicts on freedom of speech stands in favorable contrast to other injuries to fundamental First Amendment activities that the courts have sanctioned over the years. For example, section 6(b)'s limitation on individuals' First Amendment rights is less severe than those imposed by restrictions on the political activities of federal employees that the Court has upheld. *See CSC v. Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 2882, 37 L.Ed.2d 796 (1973) (approving the constitutionality of 5 U.S.C. § 7324(a)(2)) (the Hatch Act), which prevents many thousands of federal employees from holding a party office, working at the polls, acting as

---

1415–16. We accept this guidance in assessing the character of the asserted injury in this case, but we believe that in this context it does not prevent us from making the distinctions that we have.

a party paymasters, politicking for a partisan candidate, raising funds for a partisan candidate or political party, managing the partisan candidate campaign, serving as delegates to a party convention, etc.) (*Letter Carriers*).[9] And, on the same day it decided *Letter Carriers*, the Court approved, over similar First Amendment objections, the Oklahoma Merit System of Personnel Administration Act which includes as section 818, paragraph 7, an extremely harsh prohibition against personal speech, association, and other political activity. *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Section 818, paragraph 7, states:

> "No employee in the classified service shall be a member of any national, state or local committee of a political party, or an officer or member *of a partisan political club*, or a candidate for nomination or election to any paid public office, *or shall take part in the management or affairs* of any political party *or* in any political campaign, except to exercise his right as a citizen *personally* to express his opinion and to cast his vote."

Okla.Stat.Ann. Tit. 74, § 818 (1965) (Emphasis supplied).

Section 6(b) is also more hospitable to First Amendment concerns than the result in *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (*Rosario*) which permits a state to deny altogether a person's right to vote in the primary election unless enrolled in that party "approximately eight months prior to a presidential primary ... and eleven months prior to a nonpresidential primary." The holding in *Rosario* is particularly striking when read in the light of the Supreme Court's previous holdings to the effect that voting is of the most fundamental significance under our constitutional structure. *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1964); *Reynolds v. Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964) (voting is " 'a fundamental political right ... preservative of all rights.' ")

In addition, section 6(b)'s limitation is less severe than the "sore-loser" restriction approved in *Storer*, 415 U.S. at 730, 94 S.Ct. at 1279, and it contrasts favorably also with *Jenness*, 403 U.S. at 438, 91 S.Ct. at 1974, which, in the interest of maintaining manageable ballots, permits a state to keep the name of an independent candidate for office off a ballot unless the candidate is able to secure a nominating petition signed by a certain number of qualified electors. Article II, § 6(b) also appears less onerous than the practice—under the banner of "appropriate regulation"—of refusing to permit a political party as such to have any access whatsoever to the ballot because it failed to garner a sufficient number of votes in the previous election. *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Moreover, California's regulation is less harsh than other constitutionally acceptable regulations that flatly deny a candidate's access to a ballot unless the candidate can demonstrate the seriousness of his candidacy, *see Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), or unless the candidate satisfies a 7–year durational residency requirement, *see Chimento v. Stark*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973), *summarily aff'g* 353 F.Supp. 1211 (D.N.H).

On the other hand, article II, § 6(b) appears to be more far-reaching than—or at least on a par with—Kentucky's restriction on certain speech by candidates for office

---

**9.** The office of the Special Counsel, U.S. Merit Systems Protection Board issues a booklet to federal employees listing the dos and don'ts of political activity. We note that it was distributed to all federal judges on September 16, 1988, with a copy of the following resolution adopted at its September 1943 session by the Judical Conference of the United States:

> "Whereas with rare exceptions the officers and employees of the Federal courts have kept free from political activities during their terms of service, but it seems desirable to guard against deviations from this course, and for that purpose to recommend a standard: Therefore be it resolved, that it is the sense of the Judicial Conference that it is incompatible with the proper service of the federal judiciary for its officers or employees to become candidates for political office or participate in other political activities of a kind forbidden to employees of the executive branch of the government by the Hatch Act (18 U.S.C. 61h)."

which was disapproved in *Brown*, 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982). In that case, the Supreme Court struck down restrictions as to what campaigning candidates could promise to the voters in connection with the salaries of the offices for which they were running. Relying on *Mills v. Alabama*, 384 U.S. 214, 218–19, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966), for the proposition that "... there is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs ...," the Court issued a strong caution against restricting the offer of ideas by a *candidate* to the voters. *Brown*, 456 U.S. at 52, 102 S.Ct. at 1528. Section 6(b) contains no such restrictions. And, the provision under scrutiny here shares certain identifiable characteristics with the limitation on speech and association tested and found wanting in *Eu*. In that case, the Supreme Court struck down provisions of the California Election Code forbidding the official governing bodies of political parties from endorsing candidates in their *own* party primaries. *Eu*, 109 S.Ct. at 1025. As indicated, however, we believe that the First Amendment injuries in *Eu*, although similar in some important aspects to the injuries in this case, are quite dissimilar in others, and that the interests advanced in the two cases are distinguishable.

V

California law has consistently reflected the judgment that it is in the state's interest to designate judicial, school, county, and city offices as nonpartisan.[10] By definition, a nonpartisan office is an office that is independent from partisan politics. By California law, a nonpartisan office is an office whose occupants have neither been nominated nor endorsed, supported, or opposed by a political party.[11] *See* Cal. Elections Code § 37; Cal. Const. art. II, § 6(b). Section 6(b) thus represents a particular means of attempting to ensure that nonpartisan offices are nonpartisan in fact as well as in name.[12]

**10.** In 1913, California passed a statute providing that: "[i]n the case of a nomination paper for any candidate for a judicial office, school office, county office, or township office, the provisions of this subdivision shall apply *except that no such nomination paper nor any section thereof shall contain the name of any political party, or any signer thereto, nor shall the candidate be referred to as a candidate for the nomination of any party*." *See Unger*, 37 Cal.3d at 633, 692 P.2d at 253, 209 Cal.Rptr. at 489 (emphasis added) (citation omitted) (Sims, J., dissenting). The prohibition on nomination of candidates for these offices by political parties was incorporated into article II, § 2¾ of California's Constitution in 1926. Article II, § 2¾ became article II, § 6 in 1976, and was redesignated as article II, § 6(b) in 1984 with the passage of Proposition 49.

**11.** The restrictions on nomination and endorsement are the basic laws giving shape to nonpartisan offices in California. We note, however, that California law also prohibits the appearance on the ballot itself of party affiliation of a candidate and requires that partisan and nonpartisan contests be listed separately when presented to the voters in the voting booth. *See* Cal. Elections Code §§ 10200.5, 10207.

**12.** Other states have chosen a variety of means of attempting to preserve the independent character of judicial and other nonpartisan elections. Colorado, Indiana, and Missouri prohibit

judges from campaigning for any political party. Colo. Const. art. VI, § 18; Ind. Const. art. 7, § 11; Mo. Const. art. 5, § 25(f). Florida prohibits judicial candidates from campaigning as a member of a political party or from accepting funds from political parties. Fla.Stat.Ann. § 105.071. (West Supp.1988). Florida also prohibits political parties from endorsing, supporting or assisting in judicial campaigns. Fla.Stat. Ann. § 105.09 (West 1982). Georgia prohibits political parties from nominating judges in nonpartisan elections. Ga. Code Ann. § 34–1016.1 (Supp.1988). Louisiana prohibits its Educational Television Authority from supporting or opposing any political candidate. La.Rev.Stat. Ann. § 17:2506 (West 1982). Mississippi prohibits judges in primary elections from aligning themselves with any other candidate or faction within his party. Miss. Code Ann. § 23–15–973 (Supp.1987). Montana prohibits nonpartisan candidates from indicating their political affiliation in their declarations for nomination. Mont. Code Ann. § 13–14–112 (1987). The state also prohibits political parties from endorsing or contributing to the campaign of judicial candidates and justices of the peace. Mont. Code Ann. §§ 13–35–231, 3–10–201(4) (1987). New Jersey prohibits political parties from endorsing candidates before the primary elections. N.J. Rev.Stat. § 19:34–52 (1964). Thus, party screening committees are prohibited. *Cavanagh v. Morris County Democratic Comm.*, 121 N.J.Super. 430, 297 A.2d 594 (Ch.Div.1972). However,

California's interest in section (b) may therefore be identified with its interest in the impartial administration of government. Defendants-appellants state that by prohibiting political parties from supporting, endorsing, or opposing candidates for nonpartisan office, California wishes to ensure that the officials elected will be accountable to the voters rather than to the parties. Mayor Bradley of Los Angeles also links section 6(b) with the effort to make government responsive and responsible to the people as a whole. In his amicus brief in support of defendants-appellees, Mayor Bradley asserts: "[P]ermitting political parties to endorse candidates for local elections will result in undue partisan influence and control over those officials; it will undermine their independence to solve problems faced by local government and will threaten the fair and impartial administration of the law." Significantly, Mayor Bradley perceives the threat party endorsements pose to the independence of nonpartisan officials not as "the impact that endorsements may have on voters' choices but rather [their] indirect impact on elected officials' independence from partisan political pressures."[13] As the

holder of a nonpartisan office as well as a former partisan candidate for governor of California and a leader of his party, Mayor Bradley brings considerable relevant experience to assessing the need for section 6(b).

Supreme Court case law and the Constitution require the conclusion that California has a compelling interest in seeking to promote fair government and minimize the sort of "undue partisan influence and control" Mayor Bradley describes. In *Letter Carriers*, for example, the Court found the Hatch Act's restrictions on the political activities of government employees to be justified by "this great end of government—the impartial execution of the laws." 413 U.S. at 565, 93 S.Ct. at 2890. In support of this conclusion, the Court wrote:

> [I]t is essential that federal employees not, for example, take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns and not run for office on partisan political tickets. Forbidding activities like these will reduce the hazards to fair and effective government....

individuals may express their support for a candidate even though they are party officials. *Gillen v. Sheil*, 174 N.J.Super. 386, 416 A.2d 935 (Law Div.1980). North Dakota prohibits candidates from identifying their party affiliation in any nominating petition for county offices, judges, and two executive positions. N.D.Cent. Code § 16.1–11–08 (Supp.1987). Section 16.1–11–37 (Supp.1987) also prohibits partisan nominations for these offices. Section 40–21–06 (1968) prohibits candidates for municipal offices from identifying their party affiliation in their nominating petition. The North Dakota political Supreme Court has ruled that these statutes do not prohibit political parties from issuing resolutions or "other forms of support." *Haggard v. Meier*, 368 N.W.2d 539 (N.D.1985). Oklahoma prohibits candidates for judicial offices from making his party affiliation public. Okla.Stat.Ann. tit. 20, § 1404.1 (Supp.1988). Oregon prohibits candidates for nonpartisan office from campaigning as members of a political party. Or.Rev.Stat. § 249.015 (1986). The Oregon Attorney General has ruled that this statute prevents candidates from indicating the party the candidate represented in the legislature. 36 Op.Ore. Att'y Gen. 55 (1972). South Dakota prohibits parties from endorsing or nominating judicial candidates. S.D. Codified Laws Ann. § 12–9–2 (1982). And Wyoming prohibits par-

ties from contributing to any candidate in its primary election. Wyo.Stat. § 22–25–104 (1977).

13. Judge Canby asserts in his dissent that our concern is with the effect of political endorsement on the voters, not on the candidates. As our reliance on Mayor Bradley's statement suggests, Judge Canby is incorrect. To imply that nonpartisan candidates might not feel compelled to seek party endorsements is to ignore the structure of our political system. Our system is fundamentally a two-party system in which association with the Democratic or Republican party makes it possible for a candidate to call on pre-existing support for that party and the party's organizational backing. As long as this system is in place, nonpartisan candidates will find it desirable to obtain party support. Our concern *is* with the pressure party endorsements put on nonpartisan candidates to adopt views acceptable to a major party, and not, as Judge Canby states, with the possibility that voters would attach "the wrong meaning" to the party's endorsement. We see section 6(b) as making it possible for nonpartisan candidates not to be beholden to political parties rather than as a means of keeping information from the voters.

There is another consideration in this judgment: it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representing Government is not to be eroded to a disastrous extent.

Another major concern of the restriction against partisan activities by federal employees was perhaps the immediate occasion for enactment of the Hatch Act in 1939. That was the conviction that the rapidly expanding Government work force should not be employed to build a powerful, invincible, and perhaps corrupt political machine. The experience of the 1936 and 1938 campaigns convinced Congress that these dangers were sufficiently real that substantial barriers should be raised against the party in power—or the party out of power, for that matter—using the thousands or hundreds of thousands of federal employees, paid for at public expense, to main its political structure and political campaigns....

A related concern, and this remains as important as any other, was to further serve the goal that employment and advancement in the Government service not depend on political performance, and at the same time to make sure that government employees would be free from presssure and from express or tacit invitation to vote in a certain way or perform political chores in order to curry favor with their superiors rather than to act out their own beliefs.... It may be urged that prohibitions against coercion are sufficient protection; but for many years the joint judgment of the Executive and Congress has been that to protect the rights of federal employees with respect to their jobs and their political acts and beliefs it is not enough merely to forbid one employee from attempting to influence or coerce another.

413 U.S. at 565–66, 93 S.Ct. at 2890–91.

And, in dealing with an equal protection challenge to a provision of the constitution of Texas prohibiting certain officers from running for the state legislature during their terms in office, the Supreme Court spoke of the potential of politics to divert an office holder's attention from the duties of his elected position:

> By prohibiting candidacy for the legislature until completion of one's term of office, § 19 seeks to ensure that a Justice of the Peace will neither abuse his position nor neglect his duties because of his aspirations for higher office. The demands of a political campaign may tempt a Justice of the Peace to devote less than his full time and energies to the responsibilities of his office. A campaigning Justice of the Peace might be tempted to render decisions and take actions that might serve more to further his political ambitions than the responsibilities of his office. The State's interests are especially important with regard to judicial officers. It is a serious accusation to charge a judicial officer with making a politically motivated decision. By contrast, it is to be expected that a legislator will vote with due regard to the views of his constituents.

*Clements v. Fashing,* 457 U.S. 957, 968, 102 S.Ct. 2836, 2846, 73 L.Ed.2d 508 (1982). *See also Elrod v. Burns,* 427 U.S. 347, 368, 96 S.Ct. 2673, 2687, 49 L.Ed.2d 547 (1976).

We can find no authority whatsoever for the proposition that a state or a governmental entity does not have a compelling interest in having its officers discharge with fidelity to the public interest the duties for which they are responsible. That California's interests are compelling in this regard seems nothing less than obvious, and the district court so held.[14] We also believe that this interest is at least equal—if not greater than—other acknowledged legitimate interests, such as protecting the integrity of the political process from frivolous or fraudulent candidacies, efficiency in the election process, avoiding voter confusion caused by too many candi-

---

**14.** It is this conclusion that most distinguishes this case from *Eu* in which the Supreme Court was unable to find a compelling governmental interest in telling parties how to conduct their internal affairs. 109 S.Ct. at 1022.

dates on the ballot, and avoiding the expense and burden of run-off elections.

Moreover, the Constitution reflects the judgment that the government has a compelling interest in removing the federal judiciary from the danger of political influence. *See* U.S. Const., article III, § 1 (providing that federal judges are to be appointed for life and are not to have their compensation diminished). Amplifying on the view of the judiciary that underlies this provision, the Court has stated:

> [T]here rests upon every federal judge affected nothing less than a duty to withstand any attempt ... to diminish this compensation, not for his private advantage—which, if that were all, he might willingly forgo—but in the interest of preserving unimpaired an essential safeguard adopted as a continuing guarantee of an independent judicial administration for the benefit of the whole people.

*O'Donoghue v. U.S.*, 289 U.S. 516, 533, 53 S.Ct. 740, 744, 77 L.Ed. 1356 (1933). And Judge Irving R. Kaufman of the Second Circuit has pointed out that "one of the grievances against George III listed in the Declaration of Independence had been that: 'He has made Judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries! Our Founding Fathers were determined that the judiciary of the new republic would not be so feeble.'"[15]

The reasons behind the existence in our Constitution of these aspects of articles II and III are identical to the interests advanced by Mayor Bradley in support of article II, § 6(b). We do not think a meaningful distinction between state and federal judges can be made in this context. We recognize that section 6(b) applies to school boards and to all local officials, not just to the judiciary, but we believe the state has an equally compelling interest in regulating these offices. Chief Justice Burger has noted: "No simple tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to the quality of the educational process." *Milliken v. Bradley*, 418 U.S. 717, 741–42, 94 S.Ct. 3112, 3125–26, 41 L.Ed.2d 1069 (1974); *see also Dayton Board of Education v. Brinkman*, 433 U.S. 406, 410, 97 S.Ct. 2766, 2770, 53 L.Ed.2d 851 (1977) ("[Local authority in educational matters is a] vital national tradition.") (citations omitted). The other offices covered by section 6(b), offices such as mayor, city council member, county tax assessor, county supervisor, and district attorney, may not have received as much judicial attention as public education, but they belong as squarely within the realm of state as opposed to federal concerns. The state's strong interest in regulating matters of local importance thus serves to make section 6(b) in its entirety a matter of compelling state interest.[16]

## VI

We now confront the question of whether the means chosen by California to safeguard this compelling interest are overbroad. As noted above, section 6(b) represents an attempt to make nonpartisanship more than a matter of nomenclature. It expresses the judgment that simply designating an office "nonpartisan" is not sufficient to ensure its political independence, that if those who hold nonpartisan office are to be truly impartial, burdened not by partisan commitments but only by civic responsibility, political parties must be barred from active participation in the nonpartisan electoral process. This judgment is California's judgment, and it is rooted in California's history. We therefore turn to that history in an effort to understand why California has felt it necessary to insulate

---

15. Address by The Honorable Irving R. Kaufman, United States Court of Appeals for the Second Circuit, *Chilling Judicial Independence*, Thirty-Fourth Annual Benjamin N. Cardozo Lecture, delivered November 1, 1978, to the Association of the Bar of the City of New York.

16. We note that, nationwide, close to seventy percent of municipal elections are nonpartisan. Cassel, "The Nonpartisan Ballot in the U.S.," in *Electoral Laws and their Political Consequences* 226–27 (A. Grofman ed. 1986).

the process of electing judicial, school, county and city officials from the realm of partisan politics.[17]

Before beginning our discussion of the historical impetus for section 6(b), we note that our reliance on history finds support not only in the well-established principles of federalism, but also in the writings of Oliver Wendell Holmes. In his famous passage arguing that experience forms the life of the law, Holmes attests to the importance of considering a law in the context of the historical circumstances that gave rise to it:

> The life of the law has not been logic: It has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is, we must know what it has been, and what it tends to become.

O.W. Holmes, *The Common Law* 1 (1881).

We may trace the roots of nonpartisanship in California to a time when local government, including the judiciary and public school boards, appears to have been dominated by partisan political bodies which were largely under the thumb of aggressive special interests, including the Southern Pacific Railroad.[18] The pernicious activity of the "Octopus," as the Southern Pacific Railroad was often called,[19] has been summarized as follows:

> The political machine fashioned by the Southern Pacific Railroad stands as the most successful, if the most corrupt, political organization in the history of California politics. The political organization created and controlled by California's premier railroad literally ran the state's politics. The railroad, started in 1861 by Theodore D. Judah, Leland Stanford, Collis P. Huntington, Mark Hopkins, and Charles Crocker, was the single most important economic power in the state until the Progressive reforms after 1910. The Big Four, as Stanford, Huntington, Hopkins, and Crocker were known after Judah's death in 1863, entered politics to expand and protect their holdings. Their lobbyists in Washington, D.C. were able to secure a total subsidy for the railroad amounting to $27,855,000 in federal bonds and ten million acres in public lands, thereby making the Southern Pacific the richest business and the largest private landowner in the state. Furthermore, vast sums were wrested from local government and the state in the 1860's, and although such subsidies were ended in 1871, the Southern Pacific Railroad already owned 85 per cent of the state's railways and dominated land transport in California.

Local communities that refused to furnish the subsidies set by the Big Four were threatened with extinction by careful planning of the rail route to bypass them. Crocker, now famous for the art collection that bears his name, was even more famous for threatening the Los Angeles city council if they did not meet

---

17. Even as we feel compelled to assess the history of nopartisanship in California politics, however, we are mindful of the warning of noted Constitutional authority Paul Freund: "When [a judge] looks to history for a scaling of values, he is confronted ... with the problem of differentiating history from the historians: In Yeats' phrase, how to know the dancers from the dance; in Santayana's, looking over a crowd to find one's friends." Rational Decisions: Nomos VII, "Rationality in Judicial Decisions" 114.

18. See *Unger v. Superior Court, supra,* for a review of the historical background of nonpartisan election laws in California. The develop-

ment of this tradition is also extensively discussed in Lee, *The Politics of Nonpartisanship* (1960) and J. Owens, E. Costantini & L. Weschler, *California Politics and Parties* 78 (1970).

19. The term "Octopus" was coined by novelist Frank Norris in a book so entitled about events at Mussel Slough, the scene of a deadly gunfight that took place in California on May 11, 1880 between local settlers and railroad agents. *See* the Journal of the Ninth Judicial Circuit Historical Society, "Western Legal History," Vol. 1, No. 2, Summer/Fall 1988.

his demands; "If this be the spirit with which Los Angeles proposes to deal with the railroad upon which the town's very vitality must depend, I will make grass grow in the streets of your city."

The Southern Pacific had an agent in every town and village to protect its interests. In time, both Los Angeles and San Francisco had resident political machines that were controlled by the railroad. Such machines were common throughout the nation, but the "Octopus," as the railroad was christened by novelist Frank Norris, was notorious in its open display of contempt for public morals and decency. It is not surprising that the Workingmen's party made the Southern Pacific a favorite target. Nor is it surprising to find that both the Democratic and Republican parties finally reacted to such blatant corruption. The federal government, not the state government, however, finally exposed the railroad machine. As a result of information brought out in a court case, Congress formed the Pacific Railway Commission in 1887 to examine federally subsidized railroads. Although Stanford and Crocker refused to cooperate, it became evident that considerable amounts of money were spent to influence federal and state legislation, and that the Southern Pacific dominated California politics through its business agents.

Even with the exposure provided by the federal investigations, state political leaders proved to be ineffectual in dealing with the "Octopus." The task of destroying the Southern Pacific machine fell to a group of political reformers and journalists. Led by John R. Haynes and Edward A. Dickson, an incipient organization was formed to battle the Los Angeles branch of the machine, and soon editors, writers, and professional people throughout the state were joining the movement. Despite the efforts of these reformers, the Southern Pacific Railroad faced the twentieth century still the number one force in California politics. Its demise was yet to come.

California's frontier politics had disappeared by 1900. The free and easy style of the early years gave way to a sophisticated and ruthless political machine. It made little difference which party was in power, the railroad still ruled. Politicians either played the game according to Southern Pacific rules or soon found themselves out of office. Obviously the power of the railroad's political machine could be checked only by an organization of comparable power. Before the end of World War I, reformers created such an organization; an organization that not only defeated the railroad, but also shaped California's political heritage for many years.

J. Owens, E. Constantini, and L. Weschler, *California Politics and Parties* 31–32 (1969) [hereinafter Owens].

The "Octopus" was not the only corrupt entity on the California scene. Local political machines were also a major problem:

> The most important of the civic reform movements took place in San Francisco, where muckraking newspapermen joined forces with business and professional groups to battle one of the most ruthless and graft-ridden city machines in the state. The Union Labor party, under the direction of Abraham Ruef, elected its own mayor, captured the police force, ran the franchise board as a private vending operation, and used utilities rates as a means of political payoff. After capturing city hall in 1901, Boss Ruef, through the mayor's office, began a five-year orgy of bribery, blackmail, and extortion. Reformers, thoroughly disgusted with party politics and stymied at the polls, turned to the courts. The ensuing graft prosecution, 1906–1909, provided the opponents of the San Francisco machine with the ammunition they needed to start a statewide campaign against political corruption.

*Owens* at 33.

The effect of such special interests and partisan groups on elected school boards and judges was of particular concern to the public. Turn-of-the-century history provides insight into the importance for impartial government of depoliticized education

and a judiciary removed from political pressures.

In examining the historical development of California's—and indeed the nation's—tradition of depoliticized educational government at the local level, we find a turn-of-the-century history that reveals remarkable similarities to the political miasma for which the Octopuses and the Abe Ruefs of the time were responsible in other related areas. We draw knowledge and insight from R. Freeman Butts, noted historian of American education:

> The bureaucratic modernization of urban schools took several forms, each dependent on the particular political process that developed in different cities.
>
> .    .    .    .    .
>
> The early city systems of education had reflected small town and rural arrangements in which a local community elected a school board whose members ran the schools in their spare time. Their duties were to appoint teachers, select textbooks, decide where schools should be located, fix teachers' salaries, and determine how much taxes should be raised. As the city systems grew in size and cities were divided into wards for electing city officials, the wards commonly became the school board districts. When immigrant groups poured into the cities, especially from the 1880s onward, the wards became centers of ethnic concentration so that elected officials represented their ethnic constituencies. This had the merit of "keeping the schools close to the people of the local community" so that they could reflect the wishes of the people, but the danger was that the schools could easily become the special province of local political bosses. In fact, they *did* become patronage bases of ward leaders, whose wishes could determine whose daughter was appointed as teacher, or whose brother or cousin would become janitor, or who would be awarded the contract for school buildings, repair, maintenance, and supplies.

> The movement toward educational centralization was accelerated by sensational exposures in the press (in the Lincoln Steffens' muckraking genre of the day) of corruption and cronyism in the management of schools by local political bosses. With Jacob Riis and Joseph Mayer Rice leading the way, welfare-progressive reformers of a humanitarian bent were persuaded that the welfare of the children would be served by the "clean government" processes being proposed as other municipal and state reforms. Progressive reformers of an economy/business orientation were persuaded that the solution was to reduce the power of local political bosses by replacing the larger boards with smaller boards composed of more public-spirited citizens who would be elected at large or be appointed. Moreover, political cronyism would be eliminated by giving more power to professional administrators, who would establish a civil service type of personnel selection based on the criteria of merit and training, rather than on the kinship or personal relation criteria that evidently prevailed.

R.F. Butts, *Public Education in the United States: From Revolution to Reform* 177–178 (1978).

Writing in 1929, Dean Ellwood P. Cubberley of the Stanford School of Education wrote that "[n]o surer mean for perpetuating the personal and political evils in school control can be devised than the continuation of the ward system of representation." E. Cubberley, *Public School Administration* 175 (1929). Today it is estimated that in excess of seventy percent of "all American school districts provide for pure at-large and nonpartisan election of board members."[20] *See* Note, *The Voting Rights Act and Local School Boards: An Argument for Deference to Educational Policy in Remedies for Vote Dilution,* 67 Tex.L.Rev. 139, 170 (quoting from H. Zeig-

---

**20.** For additional reading on the development of school boards in the United States, see Callahan, "The American Board of Education, 1789–1960," in *Understanding School Boards* 19–46 (P.J. Ci- stone ed. 1975), and Tyack, *The One Best System: A History of American Urban Education* (1974).

ler, E. Kehoe & J. Reisman, *City Managers and School Superintendents: Responses to Community Conflict* 11 (1985)).

The tenor of late nineteenth century California regarding the effect of party politics on judges is well chronicled in the debates of California's Constitutional Convention of 1878–79. W.J. Tinnin, representative for the Third Congressional District, remarked:

> I have attended the conventions of the Democratic party, of the Independent party, and the Republican party; and what is the argument advanced therein in regard to judicial positions? Why, A already has the office, and the party owes him no more recompense; his fealty has been paid for; now give it to B, or some one else who has served the party. That argument invariably controls the convention, and you will find that those who have held the office are ousted to make room for others. Public clamor has its influence even upon Judges.

Uelman, *California Judicial Retention Elections*, 28 Santa Clara L.Rev. 333, 336 (1988) (citation omitted). And Horace C. Rolfe, representative for San Diego and San Bernadino Counties, observed:

> This idea of a justice of a Supreme Court being reelected in consequence of having been a good and efficient judge, is all a delusion. It never has happened in this State, and I do not believe it ever will happen. If a Justice of our Supreme Court is nominated for reelection, and happens to be on the ticket that wins, he is reelected. If he happens to be on the ticket in the minority, he is defeated. I have known some of our best Judges defeated because they were put up by a party that was slightly in the minority.

*Id.* (citation omitted).

To remedy the problem of party control over judges, three reforms were built over the years into California law. The first—staggered fixed year terms—appeared with California's second Constitution in 1878. The second—the designation of judicial of-fices as "nonpartisan"—occurred in 1911 as part of Hiram Johnson's package of reforms. The third—the abolition of contested elections for appellate justices in favor of incumbent retention elections—closed another gap in 1934.[21] Each of these measures emanated from a continuing effort to shelter the judiciary from politics with the objective of promoting excellence, integrity, and independence; and each grew out of real problems, not the abstract musings of academics.

Although we have focused on measures aimed at removing school boards and the judiciary from partisan influence, we do not wish to suggest that turn-of-the-century Californians restricted their concern over political corruption to those areas. A more general reform movement had begun to gather significant force before the turn of the century. This movement had two prongs: one aimed at bringing the activities of partisan politics under control and the other designed to remove altogether certain areas of government from the partisan arena.

In 1916, one faction of victorious "reformers" are reported to have viewed in retrospect the political scene which they set out to clean up as follows:

> Under the provisions of our charter, as it existed prior to 1910, the following objectionable results obtained:
>
> 1. The selection of candidates for offices nominated by party conventions dictated to and controlled by political bosses.
>
> 2. A partisan rather than an efficient administration of municipal affairs.
>
> 3. The election to offices, by a minority vote, of candidates who did not represent the choice of a majority of the voters.
>
> It was for the correction of these evils that the charter was amended in 1910, and the present system of double election enacted. That the evils complained of

---

**21.** Dean Uelman reports that the 1934 measure was the product of a statewide "good government" committee made up of civic leaders, veterans' groups, and law enforcement agencies. The committee was headed by District Attorney Earl Warren of Alameda County. Uelman, *California Judicial Retention Elections*, 28 Santa Clara L.Rev. at 339. *See also* Smith, *The California Method of Selecting Judges*, 3 Stan.L.Rev. 571, 579–80 (1951).

were real and the need of correction imperative was at the time generally conceded, and is stil conceded by all who have the welfare of the city at heart. The old municipal nominating conventions, like the county and state conventions, with their boss-chosen and boss-controlled delegates, had become intolerable; while partisan government based upon a so-called party responsibility was demonstrated to be but another name for boss rule applied to the administration of the office itself.

The present system has effectually swept these two evils for all time into the political scrap basket, and this accomplishment must be accredited to it as a positive virtue.

Jordan, "Municipal Elections," XI Transaction of the Commonwealth Club of California 173, 179 (August 1916). This passage represents not a fanciful prediction of what would happen if partisan politics become involved in municipal government, but a vivid description of an actual unsatisfactory situation which, in the judgment of its author, had just been remedied.[22]

The reforms that characterized the Progressive Era were accompanied by a positive theory of local government. This theory viewed city government as largely a matter of municipal housekeeping and emphasized such objectives as clean streets, good schools, honest courts, efficient sewers, fair property taxes, potable water, and responsive police departments. Lee, *The Politics of Nonpartisanship* 28–29 (1960) (citation omitted). These objectives were not perceived to be political, and it was widely believed that "City government must, to be efficient, be emancipated from the tyranny of the national and state political parties." *Id.* at 29 (quoting Goodnow, *National Municipal League, A Municipal*

*Program* 144–145 (1900)). Lee concludes his description of the philosophy behind the nonpartisan system with a quote from Robert Wood:

Finally, and most fundamentally, no-party politics implies some positive assumptions about political behavior that go beyond simple antagonism to partisanship. Inescapably, there is a relief that the individual can and should arrive at his political convictions untutored and unled; and expectation that in the final process of election and decision making a concensus will emerge through the process of right reason and by the higher call to the common good ... the citizen, on his own, knows best....

As a theory, nonpartisanship harks back to the traditional concept of local government, to Jefferson's high expectations for the rational capacity of the yeoman, and to that strand in American political reasoning that relies on unfettered individualism.

*Id.* at 34 (quoting Wood, *Suburbia: Its People and their Politics* 157). This Jeffersonian ideal, with its stress on "the rational capacity of the yeoman" and unfettered individualism, is the very antithesis of the kind of paternalism condemned in *Eu*, 109 S.Ct. at 1020.

History thus reveals the practical and philosophical basis for California's judgment that permitting party organizations to become actively involved in "nonpartisan" elections would erode the concept of political independence on which such elections are based. Appellees suggest that, because the rampant and overt corruption that characterized turn-of-the-century political parties in California has abated, history is irrelevant. While the abuses we have described may no longer be as widespread,[23] this improvement may have been

---

**22.** For additional insight into political corruption in American cities during this period, *see* L. Steffens, *The Shame of the Cities* (1904), M. Seasongood, *Local Government in the United States* (1934), and W. Bean, *Boss Ruef's San Francisco* (1952).

**23.** The potential for control of public officials by political parties or major economic interests is by no means an exclusively historical phe-

nomenon. On the first page of the March 7, 1989 edition of the *Wall Street Journal,* the nation's top savings and loan regulator for the government in 1983 describes himself as the hand-picked "patsy" of the U.S. League of Savings Institutions. Jackson, *Waning Power,* Wall. St.J., Mar. 7, 1989, at 1, col. 6. As he discusses the current crisis in the savings and loan industry, the "patsy" says, "I was to do what [the U.S. League] wanted." *Id.* The article goes on to

occasioned in part by removing the spoils from the grasp of the greedy—as the framers of our Constitution did with respect to the federal judiciary. We recall George Santayana's admonition: "Those who cannot remember the past are condemned to repeat it." Santayana, 1 *The Life of Reason* 2284 (1905). Guided by Santayana, we see the positive political climate produced by the reform movement not as something that makes history irrelevant, but instead as attesting to the sagacity of the reformers' impulse to restrict the activities of party organizations in municipal, judicial, and school board elections. The durability and efficacy of a solution should not be used as a reason to ignore its raison d'etre. It is possible to debate the merits of the reforms of the Progressive Era, but it is not possible to deny the existence of the real and serious predicaments which they were designed to alleviate.[24] The concreteness of California's justifications for section 6(b) stands in favorable contrast to the lack of empirical evidence in *Munro v. Socialist Workers Party,* where the Court endorsed Washington's claim that restrictive ballot qualification laws were necessary for political stability despite the absence of proof of actual voter confusion, ballot overcrowding or the presence of frivolous candidacies. *See* 479 U.S. 189, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986).

Our discussion of the reform movement and the circumstances that gave rise to it thus leads us to the conclusion that California is warranted in believing that stronger measures than a "nonpartisan" label are necessary to ensure the political independence of the office to which the label attaches. Contrary to plaintiffs-appellees' claims that the passage of Proposition 49 "brought a *radical* change in the laws governing California's elections ...," section 6(b) is simply the most recent example of a conscious effort to make nonpartisanship a fact.[25] Plaintiffs-appellees' assertion that some political party central committees in some parts of the state—but not others— have a history of encroaching on nonpartisan turf does not impeach this view. It only explains why Proposition 49 came to pass. It appears from the record that the passage of Proposition 49 was the people's way of reaffirming their strong commitment to the political independence of the judiciary, school boards, city and county government.

The question we now face is whether California is justified in taking this most recent step to safeguard the political independence of those who hold nonpartisan offices. To use the prescribed terms, we must determine whether section 6(b) is narrowly tailored to promote its intended aim of impartial administration of government. Although we perform this "least drastic means" analysis, we share Justice Blackman's discomfort with its utility:

> And, for me, "less drastic means" is a slippery slope.... A judge would be unimaginative indeed if he could not

---

describe millions of dollars in political contributions to federal candidates, including large interest-free loans to the inaugural funds of the last three Presidents of the United States, prompting Congressman Henry Gonzales of Texas to say, "Everything the industry has wanted, Congress has rolled over and given it to them." *Id.*

**24.** With all due respect, Judge Canby's dissent suffers from the defect inherent in trying to identify or to classify an object by examining one of its fundamental characteristics without giving due consideration to others. There are important facets to Section 6(b) other than its First Amendment implications. The First Amendment is not absolute. It is for this reason that we use a balancing rather than a litmus test.

**25.** California's consistent impulse to restrict the corrupting potential of party control over public officials has been described as follows:

> California is so large, its population so varied and mobile, and its society so diverse that it is difficult to generalize about the state's politics. Nevertheless, a certain recurring theme or leitmotif runs through that politics, an understanding of which brings some order to what otherwise appears senseless and unpredictable. The theme is perhaps best characterized by the term *antipartyism.* Primarily a legacy of the Progressive era of a half-century ago, antipartyism has been largely responsible for California's distinctive political character. In general, it involves a distrust of politics and the politician, a fear of strong political parties, and a conviction that political independence is a virtue.

*Owens* at 2.

come up with something a little less "drastic" or a little less "restrictive" in almost any situation, and thereby enable himself to vote to strike legislation down. *Illinois State Board of Elections v. Socialist Workers Party,* 440 U.S. 173 at 188, 99 S.Ct. 983, 992, 59 L.Ed.2d 230 (Blackmun, J., concurring); *see also Eu,* 109 S.Ct. at 1026 (Stevens, J., concurring); *Stevenson v. State Board of Elections,* 794 F.2d 1176, 1180 (7th Cir.1986) "It is not helpful to ponder what is 'less restrictive' without thinking about the functions the rules serve and how these functions would be affected by 'less restrictive alternatives.' *Every* alternative is more restrictive than some other one." (Easterbrook, J., concurring)(emphasis in original). Moreover, we share Judge Easterbrook's view that a "state need not choose a rule so much less restrictive that it also is useless in achieving the state's purposes." *Id. See also Storer,* 415 U.S. at 736, 94 S.Ct. at 1282 ("... the Constitution does not require the states to choose ineffectual means to achieve its aims.").

Having issued this caveat, we now proceed to assess whether California is justified in perceiving partisan endorsements of candidates in nonpartisan elections to be incompatible with the political independence nonpartisanship seeks to preserve. History, the record in this case, and common sense lead us to share that perception. We believe the constitutional validity of the nonpartisan concept of government itself to be at stake here. For us to hold that a political party has a protected constitutional right to endorse, support, or oppose a candidate for nonpartisan office would be to ring down the curtain on state, local, and municipal nonpartisanship. We thus reject the notion, as did the California legislature and the people of California, that California's basic laws prohibiting political parties from nominating favored candidates for nonpartisan offices and providing for nonpartisan ballots are sufficient in themselves to protect California's brand of nonpartisanship.[26]

Unquestionably, with the demise of article II, § 6(b), political parties would establish regular and formal procedures pursuant to which candidates for nonpartisan offices could solicit endorsement and support and positions on "slate mailers," procedures whereby candidates and their views and qualifications could be—and most likely would be—questioned and examined. It is extremely doubtful that such decisions to endorse or not to endorse would be ad hoc or arbitrary and capricious. Although it is difficult to predict the precise form in which these processes would appear, it is naive to believe that they would not. It is equally naive, we think, to believe that parties would rise above the temptation to support and endorse nonpartisan candidates with views incompatible with those of the party, many of which would be largely irrelevant to local government. On the other side of this coin, nonpartisan candidates would feel pressure to adopt views believed to be acceptable to the party whose money, machinery, and clout they sought to obtain. The substance of the nonpartisan process which California seeks to protect could easily be swept away by the political wind from which it is designed to be sheltered. We underscore once again that plaintiffs-appellees seek in this lawsuit, among other things, the right to place official political party and party central committee endorsements of nonpartisan candidates in the San Francisco voter pamphlet, an official government document that goes to each registered voter shortly before such election. This, in our view, would undercut the statutory prohibition against party nominations for nonpartisan offices to the point of rendering it virtually useless.

We are persuaded both by history and the logic advanced by defendants-appellees and the *amici* that party endorsements would place local officials and judges in debt to the statutory political parties and that through the endorsement and support process, the political parties would indeed

---

**26.** We reject plaintiffs-appellees' attempt to create a distinction between nomination and endorsement. Such a distinction strikes us as facile, and it ignores the substance of the issues at stake.

be able to close the door to elective office to independent-minded persons who refuse to toe the party line. It is likely that any process by which a major political party would decide whom to endorse—or support —would effectively determine who could and who could not run for that office. This is incompatible with California's rule that neither a party nor its central committee may nominate a candidate for nonpartisan office; and it is certainly the very essence of what nonpartisanship is designed to avoid.

We thus believe California to be justified in adhering to a bright-line approach to protecting its compelling interest. The First Amendment does not compel California to expand the vast and imposing array of intricate controls and restrictions on political activity already on the books in that state. Furthermore, we do not deem it prudent for the Federal Judiciary to conclude without the benefit of the legislative process that "California can adequately safeguard such [nonpartisan] interests ... by other means." [27] We do not see that the "least restrictive means" test requires California to find the thinnest possible ice on which to skate or to search for a different

pond. Insofar as the judiciary is concerned, California's approach is certainly a method of creating independence that is far less drastic than the method adopted by the Constitution of the United States. Federal judges have been removed altogether from the political fray. We suppose California could have originally adopted the same approach to selecting state judges to sit on the bench, investing them with life tenure and compensation protection.[28] Having chosen instead to require them to stand periodically for election or retention by the people, it seems reasonable to take measures to avoid control over their fate by political parties. Article II, § 6(b) accordingly strikes us as no more "paternalistic" than the federal approach to insuring the independence of the federal judiciary, and it is no more "paternalistic" than the concept of a representative form of government as compared to a true democracy.[29]

Moreover, when examined in context, section 6(b) *is* narrowly drawn. It is limited in its coverage only to those concentrations of power that pose the greatest threat to the objectives of nonpartisanism. All other groups, individuals, and associa-

**27.** The policy choices in this area are complex and difficult. Not surprisingly, the experts do not agree either on what works or what is best. To illustrate this point, we turn again to R.F. Butts:

But the questions about historical judgment are exceedingly difficult to answer. No simplistic amount of historical praise or blame of the Progressive era will do. Nagging questions persist. Was the loss of community control too high a price to pay for reducing corruption? Was the rise of professionalized expert management too high a price to pay for solving the problem of how to provide mass education to a whole population and for improving the quality of teaching through merit appointment and greater efficiency? Could corruption and inefficiency have been reduced without bureaucratization? Could diverse ethnic values have been brought into the process more constructively while at the same time improving the educative process? When settlement workers and teachers alike gave lessons in cleanliness and bathing to dirty immigrant children, were they simply imposing alien middle-class values on the working-class poor, or were they trying to improve the social and educational level of the impoverished prisoners of the urban ghetto?

These questions can certainly be debated, but the fact remains that the centralizing of school organization and professionalizing of school administration did sweep the country as a result of the political processes of the Progressive era.

R.F. Butts, *Public Education in the United States: From Revolution to Reform* 179.

**28.** *See Sailors v. Kent Board of Education,* 387 U.S. 105, 108, 87 S.Ct. 1549, 1552, 18 L.Ed.2d 650 (1967) ("We find no constitutional reason why state or local officers of the nonlegislative character involved here may not be chosen by the governor, by the legislature, or by some other appointive means rather than by an election.").

**29.** It has been argued that article IV, section 4 of the Constitution provides a textual basis for according considerable deference to the choices of the states regarding their political structures, etc.... We find the argument appealing but we do not use it as a basis for our decision. *See* Merritt, *The Guarantee Clause and State Autonomy: Federalism for a Third Century,* 88 Colum. L.Rev. 1 (1988). *See also Lance v. Plummer,* 384 U.S. 929, 86 S.Ct. 1380, 16 L.Ed.2d 532 (1966) (Black, J., joined by Harlan, J., dissenting).

tions are free to do as they please. This protects the free expression and interchange of ideas that the First Amendment is designed to promote. We respectfully disagree that the statute is defective because it fails to include *all* groups or associations that may have an interest in nonpartisan elections. This is a strength of article II, § 6(b), not a fatal defect.

In addition, article II, § 6(b) is not a law *aimed* at ideas themselves or specific information that California wishes to suppress although concededly it has this "indirect consequence." As such, it compares favorably with the statute at issue in *Eu*, 109 S.Ct. at 1016. It is a marginal and workable restriction on speech incident to a set of election rules designed to promote independence in public office.

Thus, section 6(b) is not the kind of substantial limitation or draconian restriction on free political exchange that rises to the level of incompatibility with the Constitution. With well-established principles of federalism embodied in the Tenth Amendment in mind,[30] we are loathe to order California to turn its back on one hundred years of experience and to jettison a system that gives every appearance of serving its people quite handsomely.[31] California's elected legislators—all of whom are partisan politicians—must have agreed with this analysis or they would not have passed A.C.A. 7 which placed Proposition 49 on the ballot.[32]

## EQUAL PROTECTION

■ Plaintiffs-appellees also contend that article II, § 6(b) violates the Equal Protection Clause of the Fourteenth Amendment. To support this contention, they point out that section 6(b)'s provisions cover only political parties but not other potential endorsers and supporters—including numerous "unofficial" partisan organizations and special interest groups with a stake in nonpartisan offices and candidates. Because plaintiffs-appellees' claim concerns an abridgement of a fundamental constitutional right, the First Amendment, we are required to subject section 6(b) to strict scrutiny. "[A]ny classification which serves to penalize the exercise of ... [a constitutional] right, unless shown to be necessary to promote a *compelling* government interest, is unconstitutional." *Shapiro v. Thompson*, 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1969). *See also*

---

**30.** *See* The Federalist No. 45:

"The powers delegated by the proposed Constitution to the federal government, are few and defined. Those which are to remain in the state governments are numerous and indefinite. The former will be exercised as external objects, as war, peace, negotiation, and foreign commerce.... The powers reserved to the several states will extend to all the objects, which in the ordinary course of affairs, concern the lives, liberties and properties of the people; and the internal order, improvement and prosperity of the State."

*cited* in *Garcia v. San Antonio Metropolitan Transit Auth.*, 469 U.S. 528, 570, 105 S.Ct. 1005, 1027, 83 L.Ed.2d 1016 (Powell, J., dissenting).

**31.** Justice Holmes put it well in 1922 when he said, "[i]f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it...." *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 9–10, 67 L.Ed. 107 (1922).

**32.** Indeed, in arguing for Proposition 49, Assemblyman Mountjoy stated:

Unless we specifically amend our State Constitution, political parties will dominate our historically nonpartisan judicial, county, and local election. Proposition 49 will reestablish the principle of nonpartisanism.

The greatest danger in injecting political parties into the local elective process will be a not-so-subtle creation of a patronage network. The power of the state party leaders will no doubt increase greatly, opening the door for a centralized partisan power authority of incredible financial dimensions. In many Midwestern and Eastern states, the city, state, and county jobs are brokered by the political central committees. Could this happen in California?

The opportunity will be there (without enactment of Proposition 49), and the temptation will be too great to resist. The financial and political force of state political parties can be directed toward local 46 and judicial elections.

The distinctive quality of the California political process has been the independence of the California voter. To a great extent, Section 6 of Article II of our State Constitution has created that independence and kept the partisan fox out of the local elective hen house.

Statement of Richard L. Mountjoy as to Background and Purpose of Proposition 49, 1985 (on file in Assemblyman Mountjoy's office).

*Dunn v. Blumstein,* 405 U.S. 330, 342, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972).

Our analysis of plaintiffs-appellees First Amendment challenge disposes—somewhat anticlimatically—of plaintiffs-appellees' equal protection contention. For all the reasons previously articulated in this opinion, we hold that article II, § 6(b) is necessary to defend adequately the nonpartisan objectives it was designed to shield. To strike down this part of California's constitution on the diaphanous assumption that there might be a less drastic method of achieving California's objectives would be to ignore the wisdom in the adage that the unintended consequences of an action are frequently far greater than that which was set out to be accomplished.

## CONCLUSION

Article II, § 6(b) may be characterized as a law preventing the disruption of the nonpartisan political sector from without in order to permit the selection of candidates in that sector to take place in accordance with nonpartisan principles. We endorse this characterization of section 6(b), and in so doing we hold that it is a means as narrowly tailored as consistent with promoting the compelling state interest of impartially administered government.

REVERSED and REMANDED for further proceedings consistent with this Opinion.

SNEED, Circuit Judge, concurring separately:

I concur in Judge Trott's opinion.

I write only to comment on Judge Canby's discussion of Federalist No. 45. *See infra* at 1086 n. 3.

It has become fashionable to reject arguments based on principles of federalism rooted in the Tenth Amendment by referring to the Fourteenth Amendment. Presumably the reference is to that portion of the first section of the Amendment containing the Due Process and Equal Protection Clauses as augmented by certain of the Bill of Rights. Perhaps I have missed something, but it is a fact that I have never read

of the subject of nonpartisan elections being discussed by Congress in 1866 when it debated and passed the Fourteenth Amendment. More to the point, the context of these clauses has never been constant. That is not a criticism, only a statement reflecting the life of the law, yes, even constitutional law. Incorporation of portions of the Bill of Rights, for example, is a fairly recent development that perhaps may be, or already has been, extended to the Ninth Amendment. The content of the incorporated Bill of Rights also evolves over time.

In truth, when we, circuit judges, rely on the Fourteenth Amendment to curb the powers of a state, we are only relying on our perception of what the Supreme Court presently believes the Amendment requires. Judge Trott and I share a perception; Judge Canby has another. None of us has access to any stone tablets; yes, not even the Supreme Court.

CANBY, Circuit Judge, dissenting:

Judge Trott has written well, but there is a fatal infirmity in all of the reasoning that supports California's constitutional provision. California justifies its suppression of political party endorsements because the voters, if given such information, might choose to act upon it and cause political results that the State regards as untoward. That is precisely the kind of political paternalism that conflicts fundamentally with the first amendment. *See Eu v. San Francisco County Democratic Central Committee,* —— U.S. ——, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989).

Every single evil that the State seeks to avoid flows from electoral choice. One need only look at the majority opinion's dire prediction of the results that would follow from striking down California's ban on party endorsements.

Unquestionably, with the demise of Article II, § 6(b), political parties would establish regular and formal procedures pursuant to which candidates for nonpartisan offices could solicit endorsement and support and positions on "slate mailers," procedures whereby candidates

and their views and qualifications could be—and most likely would be—questioned and examined.... It is ... naive, we think, to believe that parties would rise above the temptation to support and endorse nonpartisan candidates with views incompatible with those of the party.... On the other side of this coin, nonpartisan candidates would feel pressure to adopt views believed to be acceptable to the party whose money, machinery and clout they sought to obtain. The substance of the nonpartisan process which California seeks to protect could easily be swept away by the political wind from which it is designed to be sheltered.

Majority opinion, supra at 1079. Of course, none of these events will come to pass if the voters pay no attention to major party endorsements. The key to all of the above developments is that *many voters attach meaning to a political party endorsement* and vote accordingly. Indeed, if the process described above in fact ensues, the voters will be quite correct. Parties will endorse candidates who adhere to the parties' principles, the candidates will seek to embrace those principles, and the voter will then know that the endorsement means something. *See Tashjian v. Republic Party of Connecticut,* 479 U.S. 208, 220, 107 S.Ct. 544, 551–52, 93 L.Ed.2d 514 (1986).

Other evils envisaged by the majority 1079 "that party endorsements would place local officials and judges in debt to the statutory political parties," and that party endorsement "would effectively determine who could and who could not run for that office"—are similarly dependent upon the voters' positive reaction to the political endorsement.

To accept California's position, then, is to accept the proposition that the voters, in acting favorably upon a political party endorsement, are *making a mistake.* They are attaching too much meaning, or the wrong meaning, to the party's endorsement. Knowing that a particular party supports a candidate, the voters improperly vote for that candidate and give rise to too much party influence over local affairs. To combat this tendency, California could rely

on independent candidates to try to convince the voters that they ought not to attach such importance to party labels. But California is apparently afraid that a majority of the voters will fail to be convinced. Consequently, it has taken a much simpler route: it has prohibited statutory political parties from endorsing (or otherwise supporting) candidates in nonpartisan elections, and from publicizing such endorsements. Under our Constitution, however, that option is not open to California. "It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770, 96 S.Ct. 1817, 1829, 48 L.Ed.2d 346 (1976); *see also Anderson v. Celebrezze,* 460 U.S. 780, 798, 103 S.Ct. 1564, 1574–75, 75 L.Ed.2d 547 (1983).

Much of the majority's opinion is taken up with explanations of the beneficial effects of nonpartisan elections and an appeal to pragmatism. Good things, we are told, have followed from nonpartisan elections—good things that would not have come about if the voters were exposed to one particular vein of political speech. We are presented with Holmes' statement that experience, not logic, has been the life of the law. There are several difficulties with this line of attack.

There are times when the law should accommodate to an existing condition and there are others when the status quo must yield to principle. The first amendment is perhaps our most fundamental assertion of principle, in a document that embodies the loftiest of norms along with the most pragmatic of compromises. Properly viewed, the first amendment protects free expression as an end in itself. *See* L. Tribe, *American Constitutional Law* 576–79 (1978). But even under a narrower, instrumental view of the first amendment, there is an irreducible core requirement. It is that political speech must be free so that the sovereign people can decide public issues. To posit that the people may decide incorrectly, and therefore should be denied

information in order to steer their decisions, is to posit some other sovereign who can decide when the people are likely to be mistaken, and what they should be allowed to know. Little would be left of the first amendment under such a regime. If we are to draw a principle from Holmes, then, it should be "that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (dissenting opinion). *See also Gitlow v. New York*, 268 U.S. 652, 673, 45 S.Ct. 625, 632, 69 L.Ed. 1138 (1925) (Holmes, J., dissenting) ("If in the long run the beliefs expressed in proletarian dictatorship are destined to be accepted by the dominant forces of the community, the only meaning of free speech is that they should be given their chance and have their way").

That California is suppressing expression because of its communicative impact is enough to invalidate its action in the absence of such an imminent danger "that an immediate check is required to save the county." *Abrams*, 250 U.S. at 630, 40 S.Ct. at 22 (dissenting opinion); *see* Tribe, *supra* at 581. None of the political evils described in the majority opinion rise to that level. Indeed, it is not even clear that the evils, which are themselves well documented, were caused by political party endorsements or were cured by their suppression. I am not convinced, for example, that the influence of the Southern Pacific Railway in California politics would have been noticeably diminished if the local governments with which the railroad dealt had been elected without partisan support. Nor, I suggest, would it have been constitutional for California to solve the problem of Southern Pacific dominance by prohibiting the Railway from announcing its support for particular political candidates. *See Buckley v. Valeo*, 424 U.S. 1, 39, 96 S.Ct. 612, 644, 46 L.Ed.2d 659 (1976). Why should it be able so to restrict political parties?

Indeed, two themes seem to run throughout the majority's review of California political history: first, that California voters have a strong tradition of anti-party independence and, second, that if candidates are endorsed by political parties, the California voters will overwhelmingly vote for party candidates to the exclusion of independents. Putting the anomaly aside, the majority opinion would favor the first tendency by permitting California to prohibit the second. Underlying that choice, of course, is the conclusion that nonpartisan candidates make "better" local officials than partisan ones do.[1] That proposition is not self-evident, nor is the proposition that the interests of national political parties are irrelevant to local issues. There may be no Republican, or Democratic, or Libertarian way to build a city jail, but there may very well be Republican, Democratic or Libertarian positions on whether a jail should be built and who should be taxed for it. It is not necessarily bad government for voters to elect an official because of his partisan position on such an issue, nor for the official to feel committed to the position that got him elected. *See Brown v. Hartlage*, 456 U.S. 45, 58, 102 S.Ct. 1523, 1531, 71 L.Ed.2d 732 (1982). In any event, there is no need to decree the superiority of either the partisan or the nonpartisan local official; the voters can make that decision at each election.

Because the majority opinion is insufficiently sensitive to the point that a state may not suppress communication because of its communicative impact, it falls into other error. For example, it concludes that California's constitutional provision "is not

---

1. This assumption that nonpartisan candidates are "better" seems to underlie the conclusion of the majority opinion, *supra* at 1065, that California's prohibition of endorsements is to be treated sympathetically because it "opens" the political process to diverse interests, rather than clogging it. A diversity of viewpoints in a legislative body may or may not be a good thing, but it is

not clearly beneficial or consistent with the first amendment to suppress expression in order to bring it about. To open a system by favoring independents is to close it for the disfavored partisan candidates. Which should be elected should be left to the voters, once they are permitted to know one from the other.

a law *aimed* at ideas themselves or specific information that California wishes to suppress although concededly it has this 'indirect consequence.' " *Supra* at 1081. California's provision, however, forbids parties to "endorse, support, or oppose a candidate for nonpartisan office." The whole thrust of the majority's opinion is that a party endorsement conveys information that the state does not want to go to the voters, because they will act upon it. Article II, § 6(b) is intended to suppress that information. It is quite backward to characterize California's law as one directed at corruption and other political evils, with an indirect effect upon speech. The State's measure is directed at the content of speech, in order indirectly to achieve political consequences. That is its prime flaw.

It is also a mistake to equate political endorsement with control of the nomination process. *Supra* at 1079 n. 26. If the two are equivalent, it is only because of the effect of the endorsement on the minds of the voters. If that forbidden consideration is removed, the two categories are quite distinct. Nothing in the first amendment prevents California from establishing an open nomination process totally apart from party direction. Access to the ballot can be achieved by collection of signatures, or by some other neutral method. Such a system will permit California to achieve all the virtues it has attributed to nonpartisan office holding, if the voters agree with its goal.

The fact that California's prohibition is aimed only at statutory parties and their central committees is hardly a saving grace. Those entities, as well as their members, enjoy rights of free speech and free association. *Eu*, 109 S.Ct. at 1020. Nor is much to be gained by the majority opinion's emphasis on the fact that the parties seek to place their endorsements in the San Francisco voter pamphlet, an official government publication. San Francisco has chosen to open its voters' pamphlet to endorsement by other groups; it denies access only to the statutory parties and their central committees, as the California constitutional provision dictates. The first amendment does not require San Francisco to distribute any endorsements at all, but that is not the issue in this case. The issue is whether California can prohibit party endorsements, and their distribution. For reasons already stated, the clear answer is "no," and the answer is certainly made no less clear by the fact that California singles out political parties and permits endorsement by all others.[2]

Finally, a word about judges. It is true that the evils of partisanship appear to be greater in the case of judges than of other officials, because it is far from clear that decisions of judges ought to be responsive to the desires of the electorate, partisan or otherwise. "It is a serious accusation to charge a judicial officer with making a politically motivated decision. By contrast, it is to be expected that a legislator will vote with due regard to the views of his constituents." *Clements v. Fashing*, 457 U.S. 957, 968, 102 S.Ct. 2836, 2846, 73 L.Ed. 2d 508 (1982). The political threat to judicial independence, however, is attributable far more to the decision to elect judges in the first place, and to subject them to re-election, than it is to party endorsement. Having made that choice, the state is not free to prevent political parties or anyone else from announcing their support of a candidate; the first amendment does not permit the suppression of such information. Although the state interest is higher in the case of judges than of legislators, because of the difference in their functions, suppression of speech is too high a price to pay to advance that interest. *See Unger v. Superior Court*, 37 Cal.3d 612, 622–24, 209 Cal.Rptr. 474, 481–82, 692 P.2d 238, 244–45 (1984) (Grodin, Acting C.J., concurring). Other electoral devices, such as unopposed elections on the question of retention, long terms, or appointment are better constitutional routes to judicial independence.

### Conclusion

The decision of the majority in this case permits California to suppress political ex-

---

**2.** My view of the first amendment issues in this case makes it unnecessary for me to reach the question of equal protection, where the California provision is equally suspect.

pression because the voters might misuse the information. Our entire first amendment jurisprudence is to the contrary.

Most recently, in *Eu*, the Supreme Court struck down California's ban on pre-primary endorsements by political parties. The Court stated:

> California's ban on primary endorsements ... prevents party governing bodies from stating whether a candidate adheres to the tenets of the party or whether party officials believe that the candidate is qualified for the position sought. This prohibition directly hampers the ability of a party to spread its message and hamstrings voters seeking to inform themselves about candidates and the campaign issues.

*Eu*, 109 S.Ct. at 1020. The Court then firmly rejected California's paternalistic approach despite the reasons, including the danger of voter "confusion," offered in support of the prohibition. *Id.* at 1020–23.

The reasoning and result in *Eu* transfer easily to this case. The first amendment prevents California from suppressing information that its voters might use. The district court understood that point and struck California's provision down. I would affirm its ruling.[3]

---

**3.** The view of federalism cited by the majority opinion and drawn from Federalist No. 45, supra at n. 28, need not deter us from invalidating the California constitutional provision. The notion that federal concerns are directed toward external affairs, while the tenth amendment reserves to the states the concerns over liberties of the people, was advanced at a time when the Bill of Rights did not apply to the states. The division of powers Federalist No. 45 envisaged was radically altered by the fourteenth amendment, enacted in the aftermath of the Civil War. "We must consider what this country has be-

come in deciding what [The Tenth] Amendment has reserved." *Missouri v. Holland*, 252 U.S. 416, 434, 40 S.Ct. 382, 383–384, 64 L.Ed. 641 (1920). Nothing in our federalism as it exists today suggests that States should be the sole judges of the degree to which first amendment expression can be restricted.